**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| CASEY OAKS and JAMES MORMILE individually and on behalf of a class of similarly situated investors, | § § § § | |
| Plaintiff, | § § | CIVIL ACTION NO.  3:23-cv-02833 |
| v. | § § | |
| MARABOYINA CAPITAL, LLC and SURAJ MARABOYINA | § § § | |
| Defendants. | § § | |

## CLASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of class members described below, by and through their undersigned attorneys, LOFTUS & EISENBERG, LTD. and for their Complaint against Defendants, MARABOYINA CAPITAL, LLC and SURAJ MARABOYINA, state as follows:

### I.      INTRODUCTION

1.      Jason Cloth is a movie producer and principal of two bankrupt entities. Cloth purported to raise money for specific movie projects but instead commingled all the invested funds and moved money from entity to entity without any regard for what was agreed to with investors. At some point in or about 2021 the scheme turned Ponzi and in 2023 it went bankrupt.

2.      Hollywood loves sequels and so do Jason Cloth ("Cloth") and Aaron Gilbert ("Gilbert"). In the late 2010's Cloth's business partner Gilbert benefitted from another film Ponzi Scheme called Crystal Wealth that victimized thousands of Canadian investors. The Crystal Wealth scheme ended with a soft landing for Gilbert and a huge settlement from Crystal Wealth's auditor for not realizing the Ponzi Scheme sooner. Right about when Crystal Wealth was cratering, Creative Wealth came in and took up the mantle with Gilbert and engaged in the same practices with new investors, this time in America.

3. Since approximately 2021 Cloth does not pay investors on profitable projects, makes lulling payments on unprofitable projects to select investors, and repeatedly misrepresents facts in order to induce investment and keep investors at bay while maintaining his lavish lifestyle.

4. MARABOYINA CAPITAL, LLC and SURAJ MARABOYINA (collectively "Maraboyina") served as the de facto placement agent or broker for Cloth in America, Maraboyina held itself out as a fiduciary for investors and sold dozens of individuals on the lies told by Cloth.

II.    **PARTIES**

5. Plaintiff, Casey Oaks ("Oaks"), is, and at all times relevant to this action, has been a citizen of the state of Florida and domiciled in Florida.

6. Plaintiff, James Mormile ("Mormile"), is, and at all times relevant to this action, has been a citizen of the state of California and domiciled in California.

7. Defendant, Maraboyina Capital, LLC is a Texas Limited Liability company whose members are domiciled in Dallas County, Texas.

8. Defendant, Suraj Maraboyina, is an individual and at all times relevant to this action, has been a citizen of the state of Texas and domiciled in Dallas County, Texas.

III.    **JURISDICTION AND VENUE**

9. Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

10. This is a class action. Members of the proposed Plaintiff Class are citizens of states different from Mariboyina's home state.

11. Aggregate claims of individual Class Members exceed $5,000,000, exclusive of interest and costs.

### IV.     FACTS COMMON TO ALL COUNTS

#### A.  Suraj Maraboyina's Role in the Scheme

12.     Suraj Maraboyina was an Investment Adviser who passed a series 65 Examination.

13.     Maraboyina's focus throughout was selling and managing alternative investments for high net worth individuals and families.

14.     Suraj Maraboyina was a representative of Creative Wealth Media Finance Corp. ("CWMF") selling investment to wealthy individuals in the United States.

15.     Maraboyina came to know Oaks via a shared personal trainer. Maraboyina told Oaks about his great financial success with the movie Joker with Gilbert and proceeded to wine and dine Oaks.

16.     Maraboyina came to know Mormile via a shared acquaintance that Maraboyina mentored at his alma mater.

17.     Maraboyina wined and dined Mormile and took him out to lunch with Cloth at the Peninsula in Beverly Hills.

18.     Cloth had a rare Patek Philippe Aquanaut watch worth $500,000 delivered to him at the table during lunch in order to demonstrate his success to his potential investors.

19.     Maraboyina was taken hook, line, and sinker by Cloth and wanted to be a Hollywood producer himself.

20.     In or about January 2023 Maraboyina formed Maraboyina Capital to manage the investment in projects produced by entities controlled by Cloth.

21.     Maraboyina told investors:

I hope that you are having a good start to the New Year. I wanted to share with you that we have started our own investment firm, Maraboyina Capital (MarCap), based out of Dallas, Texas. The US-based team that you have been working with for the last 4+ years will make up the new firm. As we move forward, all future projects will be under the MarCap banner, but we will be continuing to work with CWM/BRON Studios on the repayment of all past/existing projects. We are

3

working with Finalis, who is our new SEC-registered BrokerDealer, for all investments moving forward, and will include more information on this relationship in the near future.

22.     Maraboyina claims on his website:

Welcome to Maraboyina Capital, your trusted partner in media finance. We understand that financing and investing in the media industry can be a complex and challenging process. That's why we're here to simplify it for you. Our team of experts has a wealth of experience in media finance and a deep understanding of the industry to help you make informed decisions and achieve your financial goals. Whether you're an established studio or an investor, we're here to provide you with tailored solutions to fit your unique needs.[1]

As the President and CEO, Suraj Maraboyina brings a unique blend of expertise as both a Media Financier and Executive Producer. With a wealth of experience and a proven track record of success, Suraj is well-equipped to help clients navigate the complexities of the media industry and achieve their financial goals through innovative and creative solutions.
Suraj and his team have raised over $100M into film and television projects over the course of the last few years.

23.     All of the productions Maraboyina raised money for but one, according to IMDB[2],

were with Bron or Creative Wealth.

**B. Cloth's Fraudulent Scheme**

24.     Cloth is an individual who resides in Florida. Cloth is the owner and control person of Creative Wealth Media Finance Corp. and several related entities.

25.     CWMF is a corporation incorporated under the laws of Ontario, Canada, with its principal place of business in Toronto, Canada. CWMF is a citizen of Canada.

26.     CWMF is a pass through entity with no assets.

27.     On its website, CWMF describes itself as "a prolific film and television financing company that has executive produced over 50 movies, while raising and deploying in excess of $650 million for a portfolio of critical hits, commercial blockbusters and cult favorites."

---

[1] https://www.maraboyinacapital.com/ (last accessed December 21, 2023).
[2] https://www.imdb.com/name/nm11476186/?ref_=nv_sr_srsg_0_tt_0_nm_8_q_Maraboyina (last accessed December 21, 2023).

28.     CWMF is the primary financier for BRON Studios, defined below since Crystal Wealth was shut down by regulators.

29.     Cloth is the founder of CWMF and serves as its managing director. Cloth is also the co-founder of BRON Creative, as described below, and Cloth owns 15% of Bron at all times relevant.

30.     BRON Studios, Inc. is a corporation incorporated under the laws of the Province of Vancouver, Canada, with its principal place of business in Vancouver, British Columbia.

31.     Except where otherwise noted, BRON Studios USA, Inc. and BRON Studios, Inc. are referred to together herein as "BRON Studios." Bron Studios is controlled by Aaron Gilbert and Jason Cloth.

32.     Cloth was a director of Bron at all times relevant.

33.     Bron and Gilbert were previously involved in another Canadian Ponzi Scheme called "Crystal Wealth" and portentously referred to as "CWMF".

34.     Creative Wealth follows the name and business model of Crystal Wealth and was operated by Clayton Smith ("Smith").

35.     Throughout the late 2010's Smith produced movies alongside Cloth including "The Childhood of a Leader".

36.     As of 2017, Crystal Wealth claimed to have $193 million under management that were for the most part invested in Aaron Gilbert's Media House Capital and used to fund Bron productions. Crystal Wealth operated as a Ponzi Scheme premised on funding big budget film projects.

37.     After an Ontario Securities Commission ("OSC") investigation and insolvency proceeding, Crystal Wealth's principal, Smith escaped with a fine that was never paid and Gilbert and Bron were allowed to continue with their operations and repeat the scam with a new "CWMF".

38.     Ultimately Crystal Wealth's auditor, BDO, bore the brunt of the many unpaid investors and settled for tens of millions of dollars.

39.     Right when Crystal Wealth was cratering in bankruptcy and securities enforcement actions, Bron was making millions with its new partner Creative Wealth on the movie Joker.

40.     C2 Motion Picture Group, LLC ("C2") is a Delaware Limited Liability Company operated by Cloth and Dave Kaplin.

41.     C2 was formed on May 5, 2022, just as CWMF and Bron were defaulting.

42.     Cloth raised tens of millions of dollars in the United States for several pictures and series from approximately 2019 through 2023 on behalf of Bron, CWMF, and now C2.

43.     Cloth raised the bulk of the American investment via two intermediaries or brokers, Sanford Schmidt ("Schmidt") and Maraboyina.

44.     Maraboyina's compensation from CWMF was not disclosed, but upon information and belief he received a carried interest in the "investments" he placed with CWMF.

45.     Cloth's scheme was complicated and appears that it did not matter what project an investor supposedly invested in and instead Cloth just paid who he felt he needed to in order to keep the scheme going.

46.     Investors would each be promised repayment based on the success of specific film projects.

47.     Investors were promised that they would be paid if the project was profitable and accepted the risk that they would not be paid if it was not profitable.

48.     Investors were led to believe that they had a direct interest in the project and the success or failure of the investment only depended on the profits of the project.

49.     Investors were assured that each project was thoroughly analyzed and would be successful.

50.     Contrary to the promises made, Cloth would pay whatever he felt like whenever he felt like regardless of the success or failure of the project invested in.

51.     Upon information and belief, a significant portion of the money invested was consumed by Cloth and his salesmen but never actually invested in film production.

52.     Cloth would invest in movies via various entities, but the repayments made to investors had little relation to what they purportedly invested in.

53.     Cloth would pay out on investments in failed projects when it suited his needs to keep an investor engaged.

54.     Cloth would not pay investors on successful projects when it did not suit his needs to keep that particular investor paying.

55.     At times, investors would be promised payment based on the success of projects they did not even invest in.

56.     CWMF and Bron had no internal controls, audits, or any structure in place to ensure the invested funds went where they were promised to go. The lack of auditing is the only material difference between Creative Wealth and Crystal Wealth.

57.     Cloth's scheme of misrepresentations and robbing profitable ventures to make Ponzi payments on others is best illustrated with a handful of specific projects:

**i.   Ghostbusters: Afterlife**

58.     On or about December 18, 2018, Bron Creative, the joint venture between Bron Studios and CWMF, closed a multi-picture, $100 million co-financing deal with Warner Bros. that included investment in Ghostbusters: Afterlife ("Ghostbusters").

59.     Maraboyina was instrumental in raising funds for Ghostbusters and on April 4, 2020, Cloth gave him the Executive Producer Credit for Ghostbusters.

60.     Ghostbusters was a huge financial success. Its budget was only $75 million, and it made $204 million at the box office alone following its release on November 19, 2021.

7

61.     Despite the huge success, investors were not paid.

62.     On June 15, 2022, Maraboyina emailed Mormile:

"I wanted to give you an update on Ghostbusters. We received the first studio ultimate in January, and then recently received the second one (numbers as of 3/31/2022). Profit is continuing to increase, and the next studio ultimate will come out at the end of June. I have attached the first ultimate and a screenshot of the most recent one is attached below. We will be financing repayment based upon the next ultimate. Full repayment is expected within the next 30-60 days. I appreciate your patience as this project was delayed, but I think you will be very happy with the final return. If you have any questions, please let me know"

63.     On August 26, 2022, Maraboyina emailed Mormile:

Good afternoon. I hope that you are doing well. We just received an update on the Ghostbusters repayment, and I wanted to keep you in the loop as to timing and when to expect a wire. We are working with BRON and Comerica for the line of credit that will allow us to repay principal, interest, and an initial tranche of profit as quickly as possible.

BRON and Sony have signed off on all documents and have send everything to Comerica. They are establishing a separate facility for this one transaction and not putting it through their general line of credit. While beneficial - no cross-collateralization risk for investors and straight forward reporting - it still requires a few more steps to establish than putting the studio ultimates through our existing line. BRON just received a new ultimates report from Sony that will provide for additional funds to be pulled through the facility. They have additionally already received approximately 90% of the value of the tax credits on the film, so future tax credit receipts will not have a material effect on the amount available through the refinancing. **Comerica will provide all the loan documents as well as work with Sony to get any third-party documents sorted. Sony needs to execute an NOA with Comerica confirming the agreement to provide financial information directly to Comerica and several other covenants that are specifically negotiated**. BRON got ahead of this and this document is substantially negotiated at this point. In addition to the loan documents and the Sony agreement, there are several other documents, for example, certificates of insurance from Sony, that we are working on obtaining now to ensure a quick closing. That said, **a realistic timeframe from this point forward is three to four weeks. We are doing everything we can to push Comerica to move faster than this, but I wanted to give you an estimate.**

64.     On September 15, 2022, Maraboyina emailed Mormile: "Ghostbusters repayment is imminent, so we will have that out in the next few business days."

65.     On September 21, 2022, Maraboyina emailed another investor:

**We just received an update on the Ghostbusters repayment**, and I wanted to keep you in the loop as to timing and when to expect a wire. **We are working with BRON and Comerica for the line of credit that will allow us to repay principal, interest, and an initial tranche of profit as quickly as possible.**

BRON and Sony have signed off on all documents and have send everything to Comerica. They are establishing a separate facility for this one transaction and not putting it through their general line of credit.  While beneficial - no cross-collateralization risk for investors and straight forward reporting - it still requires a few more steps to establish than putting the studio ultimates through our existing line....
Comerica will provide all the loan documents as well as work with Sony to get any third-party documents sorted.  Sony needs to execute an NOA with Comerica confirming the agreement to provide financial information directly to Comerica and several other covenants that are specifically negotiated.  BRON got ahead of this and this document is substantially negotiated at this point.

In addition to the loan documents and the Sony agreement, there are several other documents, for example, certificates of insurance from Sony, that we are working on obtaining now to ensure a quick closing.

That said, **a realistic timeframe from this point forward is 5-7 business days**. We are doing everything we can to push Comerica to move faster than this, but I wanted to give you an estimate

66.     On October 4, 2022, Maraboyina emailed Mormile:

"I spoke with Arron this morning **and we are waiting on funds from Comerica which will then be transferred to BRON and then to CWM.** We are expending this any day now. I know the delay has been frustrating for everyone; I following up daily with Aaron Gilbert and his team"

67.     On October 28, 2022, a Maraboyina employee emailed Mormile:

"We have a checklist call with Akin (bank's counsel) today but we don't have that far to go to get to a closing on Ghostbusters. Because it's being pulled from our general line of credit, we'll need Union's approval and a few other issues need to be addresses, but the action loan itself is quite advanced and I don't see other issues causing any material delays...."

68.     On February 16, 2023, Cloth emailed Maraboyina: "we are expecting $ right now

within days."

69.     On February 19, 2023, Cloth emailed Maraboyina: "26% and it will be in next

week."

70.     Cloth told another investor Bron received 33% of the profits.

71.     Mormile was never paid anything for his Ghostbusters investment.

72.     Maraboyina never investigated why a line of credit would be necessary to pay the proceeds of the investment.

73.     Plainly, Cloth promised more returns than he could satisfy and Maraboyina was oblivious to the inner workings of the scheme he was promoting.

74.     Another investor was repaid less than half his principal invested in Ghostbusters, and payment came from an entity called Shaggy Dog Media that was not disclosed in any investment documents.

75.     In July 2023, Cloth said another large investor was paid on Ghostbusters.

**ii. Monkey Man**

76.     CWMF and Bron produced the Dev Patel movie, Monkey Man. It was produced at a total expense of $10,500,000 and then sold to Netflix for $34,000,000.

77.     Monkey Man was a huge success.

78.     Oaks invested $250,000 on or about October 25, 2020, another $100,000 on November 6, 2020, and another $94,0000 on March 12, 2021.

79.     Cloth claimed that Creative Wealth actually received 25% of Monkey Man's net profits in compensation for a $6,500,000 loan.

80.     Further, Creative Wealth had registered a charge on Kid Unknown Holdings Ltd., the production company for the Monkey Man project, on or about March 30, 2021 and that this charge was satisfied on or about August 6, 2021. In other words, it appears as though Creative Wealth received monies in connection with the Monkey Man project over two years ago, yet has failed to pay anything to investors.

81.     On September 7, 2022, Maraboyina emailed Oaks:

Netflix has the film and editing is complete. BRON is finalizing everything with Netflix's lawyers, and we expect everything to be completed in the coming weeks. Netflix will be paying BRON starting at the end of the year, but CWM is going to be paying investors in the next month or so with other funds.

82.     On October 10, 2022, Maraboyina gave an interview for a podcast with his alma mater wherein he explained that Monkey Man was his greatest financial success in film production.

83.     Despite the success of Monkey Man, Oaks and the class were not paid on their investment in the project.

**iii. Shadowplay**

84.     On or about March 19, 2020, Oaks invested in financing episodes 101-108 of the series Shadowplay.

85.     Oaks also entered into a participation agreement that provided:

Financier shall participate in the Collections and be repaid principal and interest and share in "Adjusted Gross Revenues" derived from exploitation of the Picture, on and subject to the terms provided in Schedule "A" to the extent of its Participation.

Lender agrees to pay and otherwise account to Financier on or about fifteen (15) calendar days after Lender's actual receipt of amounts due and payable to Lender pursuant to the Financing Agreements, amounts due and payable to Financier, pursuant to the Client Term Sheet in respect of the Participation, as such amounts are earned and paid by the Borrower to Lender, pursuant to the terms of the Financing Agreements

86.     On July 16, 2020, Cloth entered into term sheet for another loan for the same project with the same terms with Hudson, LP.

87.     On December 9, 2020, Maraboyina emailed Oaks:

The production risk isn't an issue for any of your investments. Digital Animation will be sold within a couple of months. Shadowplay repayment is scheduled for February.

88.     On March 4, 2021 Oaks texted Maraboyina:

Q: Hey do you have any update on Shadowplay repayment?
A: Will have an update from BRON by end of the day today.

11

89.     On April 16, 2021, Maraboyina emailed Oaks:

Casey, I hope that you are doing well. I wanted to get back to you regarding an update on Shadowplay. The sale to Netflix is being finalized right now but has been delayed several weeks as a result of..."

90.     Oaks told Maraboyina that he could invest more as soon as Shadowplay paid off.

91.     On February 2, 2022, Oaks' investment in Shadowplay miraculously paid off right in time for Oaks to invest in National Anthem.

92.     Oaks made $298,195.48 on the $250,000 investment in Shadowplay.

93.     Oaks' payoff on Shadowplay had nothing to do with the success of the investment and everything to do with his willingness to rollover the investment into another project.

94.     Cloth stated in affidavit filed on December 16, 2022 in SDNY 1:22-cv-05520:

[Shadowplay] was not successful as Creative Wealth had hoped, and Shadowplay did not generate sufficient gross receipts to pay Hudson. Therefore, no amount is due and owing to Hudson, from Creative Wealth or anyone else" (affidavit exhibit) "repayment of those outstanding amounts was conditioned on Shadowplay's generation of sufficient receipts."

95.     The same terms for the same investment yielded a 20% profit for one investor while another investor received nothing on the same purportedly failed project.

**iv. Gossamer**

96.     Oaks and the Class invested in two failed projects Fables and Gossamer.

97.     Both projects were complete failures and nothing was paid.

98.     On June 3, 2022, Oaks invested in Gossamer.

99.     On June 16, 2022, Maraboyina told Oaks that CWMF renegotiated the deal with Bron and was now getting 40% of the profits on Gossamer.

100.    On January 27, 2023, Cloth communicated to Schmidt in Illinois:

I've been asked to provide a further update on the initial financial exit from the various film / TV productions financed by all of you.  Firstly, and I cant stress this strongly enough, there is zero risk of non repayment.  **All the shows, except for**

12

**Bear Grylls (that deal is being worked on now) are sold and have sold for far in excess of production cost**.  I think Ive stated this before, film finance is very much akin to a first lean construction finance loan.  Other then the first 10-15% of monies received, we are always the first party to be repaid with interest.  Just like construction, the purchaser of the property does not "close" until the project is delivered as substantially complete.  That is exactly the same mechanic in film at tv finance.  We have multiple, non related productions contained within a fund and a few one off productions that sit exclusive to the media fund.  Delivery of all of these shows will occur anywhere from a few months from now to 18-24 months from now.  If we waited for delivery and payment from the studios / distributors repayment would be irregular and very choppy.  I found over the years that didn't sit well with clients and caused needless angst to clients.  **Aaron Gilbert and myself took it upon ourselves to put in place a credit facility which allows us to take deal paper and bring forward the cash value.  That value is to exclusively be used to repay clients from the underlying deals.  To get to that point all 26 agreements on all 9 shows need to be legally reopened and Comerica inserted as a party to the transaction**.  Once new docs are drafted, they must be sent to the legal council of every party connected to each show for review and comment.  Once everyone has agreed to all of the new docs they have to go out for wet ink signatures.  **Once all the wet ink is back at Comerica, closing is arranged (usually within 48 hours) and funds are transferred to our collection account for distribution to clients.  Closing a bank facility for 1 show is heavy work, 9 is enormous.**  Covid played a role in slowing the lawyers work in Dec and early Jan, but things are rolling along now.  I've told Sandy this on numerous occasions that there are probably 100 people working to push all parties to review, comment, sign, and execute documents as soon as possible.  I cant push people any harder.  They will stop taking my call.  We are all at the end here.  **I anticipate funds closing very shortly, as a matter of fact I'm being told imminently.  The payments being processed now will allow for full exits with all outstanding interest.**  Further profit participation will provide investors with returns well above 100%.  Future revenues will include; merchandise, gaming, publishing, music, digital strategies (nft).  You all will make money for years to come from there shows.  For further comfort (and please do not share any of this info with anyone outside our group), I am going to give out the purchase details for each show.  For clarification  though, I must admit that I don't have all of the waterfalls yet (those are being prepared) so I cant quite calculate the exact quantum of profit owed to us per project.  Also please remember that we are only one of many parties entitled to profit participation.

**Monkey Man**
 10,500,000cost
Netflix  33,000,000 purchase price

**Hailey and the Hero Heart**
2,775,000 (CW Loan)
Warner Brothers (Cartoon Network)  3,650,000 (only for North America)

The rest of the world is being sold now

**Bubbles Hotel**
5,500,000 (CW Loan)
Warner Brothers (Cartoon Network)   8,700,000 purchase price

**Fables**
10,500,000 cost
Netflix (North America) Paramount + (Rest of World)
17,000,000 purchase price

**Gossamer**
10,800,000 cost
Netflix (North America) Paramount + (Rest of World)
18,700,000 purchase price

**Robin Hood**
 In production

Bear Grylls Corporate have agreed to post a corporate guarantee of our loan.  That guarantee is being financed with our Comerica line as well.  Clients will reveive their investment plus outstanding interest.  A distribution deal is being worked on now, and I should have further details shortly to share with you.

As always, I don't take it lightly that you have all entrusted me with your hard earned money.  We are always very careful to select shows that we identify as those with the greatest return potential that can survive in all market conditions.  I know you will all be happy and impressed with the total return performance of these first few shows.

101.    Cloth told Schmidt that Gossamer was already sold but didn't pay Oaks anything for his investment in it.

102.    Cloth's favorite lie to deploy when in a bind is that a Comerica line of credit will soon come save the day and neither Schmidt nor Maraboyina bothered to confirm there was actually a line of credit or that it would be used to pay investors.

**C.  Bron Bankruptcy**

103.    On July 10, 2023, Cloth spoke to a group of investors in Illinois about the Bron bankruptcy.

104. Remarkably, Cloth attributed all the failures and investment losses to Bron despite the fact that he was an owner and director of Bron.

105. Cloth said the cause of the bankruptcy was "it's financial mismanagement" and that "we haven't worked with Bron in a about a year and a half."

106. He claimed CWMF had nothing to do with it and no liability because "we are a flow through entity."

107. Cloth claimed, "we know that there is value in other investments Bron made" and that C2 agreed to pledge its share to a bank for a line of credit to repay the Bron and CW investors.

108. Just like he did years earlier, Cloth claimed Comerica would come to the rescue and "credit facility will be in place within 90 days" and "we [C2] will pull revenue forward to pay off those notes".

109. Cloth boldly claimed that CW and Bron investors would be paid soon based on the success of C2's investment in Mission Impossible.

110. Cloth claimed in July 2023 that was a 100% likelihood that he would repay the notes to the Illinois within 110 days of July 10, 2023.

111. The Comerica line of credit was made up. Just like before.

112. Mission Impossible, while a huge production was not profitable, and Paramount lost $40,000,000 on the production.

113. C2 is not listed on IMBD as a producer of Mission Impossible.

**D. Maraboyina's Ignorant Participation in the Scheme**

114. Cloth raised money in the United States via two principal firms who acted as placement agents selling notes for investment, including Maraboyina, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in promissory

notes and co-investment agreements used to fund individual projects offered by Cloth (hereinafter "Cloth Offering").

115.    Cloth's scheme was a house of cards and an iota of due diligence by the middleman earning the commissions would have demonstrated this investment was not safe for anyone.

116.    Maraboyina relied on personal relationships and word-of-mouth referrals to obtain investors.

117.    Maraboyina typically solicited investors in person, over the telephone, and via email for the Cloth Offering.

118.    Maraboyina claims solicited over $100,000,000 in investment for the Cloth Offering of which approximately $60,000,000 remains outstanding.

119.    Maraboyina was Cloth's salesmen and broker raising money for Cloth throughout the United States.

120.    Maraboyina negligently relied on only representations from Cloth when recommending the investment to Plaintiffs and the Class rather than confirming anything with third parties or looking into Bron or CWMF's finances.

121.    The capital deployed by Maraboyina was provided by Plaintiffs and the Class.

122.    During this time, Cloth made representations and provided purported contracts, emails, and other information to Maraboyina, which Maraboyina negligently believed to be true and accurate without investigating the obvious holes in the story that was far too good to be true.

123.    Maraboyina proceed to sell Plaintiffs and the Class investments in the Cloth Offering by regurgitating the lies told by Cloth.

124.    Maraboyina acted as the gatekeeper of information from Cloth.

125.    Plaintiffs and the Class reasonably relied on Maraboyina's due diligence on the investment and representations that they were actually investing in specific projects rather than Cloth's personal piggy bank.

126.    Rather than relying on any substantive investigation of its own, Maraboyina relied on the fact that Cloth kept paying as sufficient evidence that the apparent Ponzi Scheme was legitimate.

127.    Maraboyina was taken hook, line, and sinker by Cloth and did not bother to do his own independent due diligence when promoting the Ponzi Scheme.

128.    Maraboyina kept his head in the sand so long as the lulling payments kept coming in from Cloth.

129.    After the defaults Maraboyina admitted to investors he was in the dark on how Cloth's scheme operated and where the invested funds went.

130.    Maraboyina admitted to no understanding the investment he sold and its relationship with the previous Ponzi Scheme.

131.    Maraboyina admitted he did not know that CWMF was in litigation in Canada relating to Class members investments at the time they invested.

132.    Maraboyina further admitted to eventually discovering the underlying fraud that he knew or should have known about prior to the investment.

133.    Maraboyina said he was in communication with Schmidt trying to coordinate what his investors were being paid on.

134.    On October 20, 2023, Maraboyina stated "If I walk into any FBI/Justice Department and he's toast and he knows that" and "Jason [Cloth] knows he has a gun to his head".

135.    On October 31, 2023, Maraboyina stated in a phone call to a class member "[Cloth] either takes care of it or he's going to jail, he knows I will fuck him... he knows I'd testify against him, he knows I would" and added "I'm not taking his [Cloths'] side at all".

### E.  Maraboyina's Duty to Plaintiff and the Class

136.    The Cloth Offerings were structured as co-investment in various film projects.

137.    For all intents and purposes, Maraboyina was acting as a placement agent for Cloth and paid to make the sales.

138.    Plaintiffs and the Class reasonably relied on Maraboyina's representations and due diligence into Cloth because he was an investment advisor who passed a Series 65 Examination and he was at all times relevant a Registered Representative of Finalis Securities LLC Member FINRA/SIPC

139.    Placement agents such as Maraboyina who sell private placements to retail customers for a commission, such as Maraboyina, are required to register with the Financial Industry Regulatory Authority ("FINRA").

140.    FINRA regulates broker/dealer firms like Maraboyina and their registered representatives (*i.e.*, stockbrokers), and promulgates rules and regulations that brokerage firms and their registered representatives must adhere to.

141.    A placement agent, or at least a party acting in that role such as Maraboyina, is required to perform reasonable due diligence on a private placement prior to offering it for sale to its customers pursuant to FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26, 17 C.F.R. § 240.15l-1(b)(1).

142.    SEC Regulation Best Interest ("Reg B1") provides Maraboyina as a placement agent owed the following duties to Plaintiff and the Class:

(ii) Care obligation. The broker, dealer, or natural person who is an associated person of a broker or dealer, in making the recommendation, exercises reasonable diligence, care, and skill to:

(A) Understand the potential risks, rewards, and costs associated with the recommendation, and have **a reasonable basis to believe that the recommendation could be in the best interest of at least some retail customers**;

(B) **Have a reasonable basis to believe that the recommendation is in the best interest of a particular retail customer based on that retail customer's investment profile and the potential risks**, rewards, and costs associated with the recommendation and does not place the financial or other interest of the broker, dealer, or such natural person ahead of the interest of the retail customer;

(C) Have a reasonable basis to believe that a series of recommended transactions, even if in the retail customer's best interest when viewed in isolation, is not excessive and is in the retail customer's best interest when taken together in light of the retail customer's investment profile and does not place the financial or other interest of the broker, dealer, **or such natural person** making the series of recommendations ahead of the interest of the retail customer.

(17 C.F.R. § 240.15l-1(b)(1).)

143.    In order to ensure that it has fulfilled its responsibilities, FINRA requires that a broker-dealer in a Regulation D offering must, at a minimum, conduct a reasonable investigation concerning:

    a.    the issuer and its management;

    b.    the business prospects of the issuer;

    c.    the assets held by or to be acquired by the issuer;

    d.    the claims being made; and

    e.    the intended use of proceeds of the offering.

144.    Maraboyina had a duty to conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer.

145.    FINRA has also provided detailed guidance on how a broker-dealer such as Maraboyina was acting with the Cloth Offering may ensure an adequate investigation has taken place into the issuer and its management, the issuer's business prospects, and the issuer's assets.

146.    As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Cloth and its history by Maraboyina would have included:

a.    Examining historical financial statements of Cloth, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management;

b.    Looking for any trends indicated by Cloth's financial statements;

c.    Contacting customers and suppliers regarding their dealings with Cloth;

d.    Reviewing Cloth's contracts, leases, and financing arrangements;

e.    Inquiring about Cloth's past securities offerings and the degree of their success; and

f.    Inquiring about the length of time that Cloth had been in business and whether the focus of its business was expected to change.

147.    This was not done here. The full extent of the investigation was reliance on information supplied by the apparent Ponzi Schemer. There was zero independent investigation done by Maraboyina.

148.    As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Cloth's business prospects by Maraboyina should include:

a.    Inquiring about the viability and value of any movies funded by Cloth;

b.    Inquiring about the industry in which Cloth operates, and the competitive position of Cloth; and

c.    Requesting any business plan, business model or other description of the business intentions of Cloth and its management and their expectations for the business, and analyzing management's assumptions upon which any business forecast is based.

> A broker/dealer should test models with information from representative assets to validate projected returns, break-even points, and similar information provided to investors.

149.     This was not done here. Instead, it is apparent that Cloth oversubscribed each investment and operated a Ponzi Scheme with the excess investment.

150.     Minimal investigation would have confirmed that the investments were oversubscribed and investors were getting paid with new investments rather than proceeds of the movies they supposedly invested in.

151.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Cloth's assets and facilities should include:

   a.     Carefully examining any reports by third-party experts that may raise red flags;

   b.     Obtaining an expert opinion from auditors and financial experts and others as necessary to form a basis for determining the suitability of the investment prior to recommending the security to investors;

   c.     Inquiring about previous or potential regulatory or disciplinary problems of the issuer;

   d.     Obtaining a credit check of Cloth;

   e.      Making reasonable inquiries concerning the issuer's management. Maraboyina should have inquired about such issues as the expertise of management for the issuer's business and the extent to which management has changed or is expected to change;

f.  Inquiring about the forms and amount of management compensation, who determines the compensation and the extent to which the forms of compensation could present serious conflicts of interest. A party acting as a broker-dealer might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of the issue; and

g.  Inquiring about the length of time that the issuer has been in business and whether the focus of its business is expected to change.

152.  Maraboyina failed to do this third party confirmation of this supposedly nine-figure operation.

153.  A broker-dealer that offers securities, including those offered under Regulation D, must meet the suitability requirements of FINRA Rule 2111. This means that the broker-dealer must have a reasonable basis to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer.

154.  FINRA Rule 2111.05(a) is the source of a broker-dealer's obligation to perform a reasonable investigation of the issuer and offered securities before offering securities in a Regulation D for sale to its clients.

155.  Reasonable-basis suitability requires that a broker-dealer (1) perform reasonable diligence to understand the potential risks and rewards associated with a recommended security or strategy and (2) determine whether the recommendation is suitable for at least some investors based on that understanding. A broker-dealer can violate reasonable-basis suitability under either prong of the test.

156.     Maraboyina could not rely blindly upon the issuer for information concerning a company, nor may it rely on the information provided by the issuer in lieu of conducting its own reasonable investigation.

157.     While broker-dealers like Maraboyina are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a high degree of care in investigating and independently verifying an issuer's representations and claims. The fact that a broker-dealer's customers may be sophisticated and knowledgeable does not obviate this duty to investigate.

158.     Of course, under these circumstances, Maraboyina was in a position to know more about Cloth, understand its business, its finances, and its outlook better than just a mere broker-dealer since it was acting as its placement agent or investment banker raising capital exclusively for Cloth.

159.     As the de facto placement agent and investment banker for Cloth, Maraboyina was in a unique position compared to another broker-dealer that was merely part of the investment banking syndicate.

160.     In the course of a reasonable investigation, a broker-dealer must note any information that it encounters that could be considered a "red flag" that would alert a prudent person to conduct further inquiry. A broker-dealer's reasonable investigation responsibilities obligate it to follow up on any red flags that it encounters during its inquiry as well as to investigate any substantial adverse information about the issuer. When presented with red flags, the broker-dealer must do more than "blindly rely" upon representations by the issuer's management or the disclosure in an offering document.

161.    As described below, unfortunately for the Plaintiffs and the Class, Maraboyina failed to conduct proper due diligence, which caused Defendant's conduct to fall below the standard of care thereby breaching the duties that it owed the Plaintiffs and the Class.

## F.  Cloth Defaults

162.    The cascade of defaults and lawsuits starting in 2019 and culminated in two bankruptcy filings.

163.    In or about September 2022 the OSC interviewed several individuals involved in the scheme.

164.    On or about July 19, 2023, Bron filed for bankruptcy protection in Vancouver and a Creative Wealth entity offered to provide Debtor in Possession financing.

165.    On or about October 27, 2023, CWMF filed for bankruptcy protection in Ontario.

## G.  Plaintiffs' Investments Placed by Maraboyina

166.    Oaks was first sold on the Cloth Offering in early March 2020 and made the following investments that were not repaid:

a.      March 5, 2020-Monkey Man- $250,000

b.      May 14, 2020-Fables- $50,000

c.      May 29, 2020-Bubble's Hotel-$50,000

d.      June 26, 2020-Young Bear Grylls-$50,000

e.      July 23, 2020-Hailey and the Hero Heart-$150,000

f.      November 6, 2020-Monkey Man-$100,000

g.      March 12, 2021-Monkey Man-$94,000

h.      February 4, 2021-National Anthem-$250,000

i.      May 12, 2022-Robinhood-$500,000

j.      June 9, 2022-Gossamer-$500,000; and

       k.     July 15, 2022-Gossamer-$150,000

167.    All of the investments listed above were a total loss and to date, Oaks is owed over $3,400,000 from investments placed with Maraboyina.

168.    Mormile fortunately only invested in one project and invested $125,000 in Ghostbusters on July 29, 2019.

169.    Mormile's investment was a total loss.

170.    Plaintiffs justifiably relied on Maraboyina's representations about the suitability of investment in Cloth Offerings.

171.    Plaintiffs relied on Maraboyina to investigate the Cloth Offerings and confirm facts presented in the offering materials.

172.    Plaintiffs justifiably relied on Maraboyina's statements about the investment and that Maraboyina had a reasonable basis for recommending the investment.

## V.    **CLASS ALLEGATIONS**

173.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated, comprising a class consisting of:

> *All persons who invested in Creative Wealth Media Finance Corp.'s projects offered by Maraboyina from January 1, 2019 to December 31, 2022.*

Excluded from the proposed Class are Defendants, their respective officers, directors, and employees, affiliates, legal representatives, heirs, successors, or assignees. Plaintiffs reserve the right to amend the Class definition as necessary.

174.    Plaintiffs are members of the Class.

175.    Excluded from the Class are judicial personnel involved in considering the claims herein, all persons and entities with claims for personal injury, the defendants, any entities in which

the defendants have a controlling interest, and all of their legal representatives, heirs and successors.

176.    It is estimated that the Class consists of hundreds of persons throughout the continental United States. The members of the Class are so numerous that joinder of all members, whether otherwise required or permitted, is impracticable. The exact number of Class members is presently unknown to Plaintiffs, but can easily be ascertained from the sales and warranty claim records of Defendant.

177.    There are numerous questions of law or fact common to the members of the Class which predominate over any questions affecting only individual members and which make class certification appropriate in this case, including:

   a.    Whether Defendants, owed an extra-contractual duty of ordinary care to Class Members;

   b.    Whether Defendants, breached their duty of ordinary care to Class Members;

   c.    Whether Defendants, negligently misrepresented the facts regarding the Cloth Offering to Class Members;

   d.    Whether Defendants violated Texas Securities Law; and

   e.    Whether Defendants were unjustly enriched.

178.    The claims asserted by Plaintiffs are typical of the claims of the members of the Class.

179.    This class action satisfies the criteria set forth in Fed. R. Civ. P. 23(a) and 23(b)(3) in that Plaintiffs are members of the Class; Plaintiff will fairly and adequately protect the interests of the members of the Class; Plaintiff's interests are coincident with and not antagonistic to those

of the Class; Plaintiffs have retained attorneys experienced in class and complex litigation; and Plaintiff have, through their counsel, access to adequate financial resources to assure that the interests of the Class are adequately protected.

180.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

   a.   It is economically impractical for most members of the Class to prosecute separate, individual actions;

   b.   After the liability of Defendants has been adjudicated, the individual and aggregate claims of all members of the class can be determined readily by the Court; and

   c.   Litigation of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members that would substantially impair or impede the ability of other Class members to protect their interests.

181.    Class certification is also appropriate because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory and/or injunctive relief with respect to the claims of Plaintiffs and the Class Members.

   **VI.    CLAIMS**

**COUNT I**
**Negligent Misrepresentation**

182.    Plaintiffs, individually and on behalf of the Class, restates and realleges paragraphs 1 through 181 as though fully set forth herein as paragraph 182.

183.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry. In this case, the applicable standards of

conduct for Maraboyina are the rules promulgated by FINRA which each broker offering securities such as the Cloth notes should be a member of.

184.    Those who undertake any work or calling for which a special skill is required such as a broker-dealer have a duty not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability.

185.    Defendant owed Plaintiff and the Class a duty to act as a reasonably prudent broker-dealer would do under the same or similar circumstances. The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by FINRA. These duties and obligations flow to Plaintiff and the Class members as a result of the client relationship between Maraboyina, the Plaintiff, and the Class.

186.    As set forth above, Defendants breached their legal duty to provide accurate information to Plaintiffs and the Class as prospective purchasers of investments in Maraboyina by omitting material facts, and such material facts were necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

187.    By reason of the aforesaid, Defendants are guilty of negligent misrepresentation and omission in connection with the offer and sale of investments in Cloth Offerings.

188.    At all times relevant to this action, Defendants had knowledge of, or reasonable grounds to believe the existence of facts by reason of which their liability under this Count is alleged to exist, and with this knowledge, Defendants made material omissions of fact with respect to the offer and sale of securities.

189.    As described above, Defendants negligently breached their duties to Plaintiffs and the members of the Class.

190.    Had a reasonably prudent broker-dealer under the same or similar circumstances conducted adequate due diligence on Cloth to understand the risks and rewards of the Cloth

Offerings, it would have concluded that the risks in investing in Cloth far outweighed any potential reward, and it would not have approved of the Cloth Offerings for sale to any of its clients.

191.    By approving of the sale of the Cloth Offerings to its clients, notwithstanding the numerous red flags identified herein, Cloth demonstrated that it failed to understand the risks and rewards of the Cloth offerings, or consciously ignored the risks presented by these red flags in order to ensure it maximized its placement agent fees and commissions.

192.    Maraboyina knew or should have known that Plaintiff and the Class would place their trust and confidence in Maraboyina that it had a reasonable-basis to conclude that Cloth was suitable for at least some investors, and that it had conducted adequate due diligence to understand the risks and rewards of the Cloth offering.

193.    Maraboyina knew or should have known that it was reasonably foreseeable that Plaintiff and the Class would act in reliance on Maraboyina's approval to sell the Cloth Offerings.

194.    Plaintiff and the Class acted in reliance on Maraboyina's approval to offer to sell the Cloth offerings.

195.    But for Maraboyina's approval to sell the Cloth Offerings, Plaintiffs or the Class members would not have even been presented the opportunity to participate in the Cloth Offerings.

196.    As a direct and proximate result of Maraboyina's negligence, Cloth is liable to Plaintiff and the Class for all of the investment losses that they suffered in Cloth.

## COUNT II
### Violation of Texas Securities Act

197.    Plaintiffs, individually and on behalf of the Class, restates and realleges paragraphs 1 through 181 as though fully set forth herein as paragraph 197.

198.    At all times relevant, there existed in the State of Texas, a statute entitled the Texas Securities Act ("TSA").

199.   The Cloth Offer including the promissory notes entered into by Plaintiff that are the subject of this Complaint are "securities" as defined in the TSA.

200.   Pursuant to Section 33 of the TSA, it is unlawful for any person to: "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading".

201.   In 2019 through 2021 Defendants, did offer, as that term is defined in the TSA, an investment in the Cloth Offering to Plaintiffs by a solicitation by Defendants.

202.   Defendants issued numerous statements and other papers or documents touting the value of the Cloth Offering.

203.   This solicitation contained materially false and untrue statements including negligent misrepresentations about the nature of Cloth's scheme.

204.   Defendants' solicitation Plaintiffs to invest in the Cloth offering omitted to state the following material facts that were required to make the statement contained in the solicitation not misleading:

a.   That Creative Wealth was operated by the same principals who ran another Ponzi Scheme called Crystal Wealth;

b.   That the investments in profitable movies were oversubscribed;

c.   That the invested funds were not used on the specific projects promised;

d.   That investors would be paid from a line of credit rather than from the proceeds of the films they invested in;

e.   That Maraboyina had no personal knowledge of how the invested funds were deployed;

    f.      Cloth did not employ an accountant or bookkeeper to track the invested funds and funds returned to investors;

    g.      That profits on successful projects would be diverted elsewhere;

    h.      Cloth was spending the investor funds on his own lavish lifestyle; and

    i.      Other material facts detailed herein.

205.    Plaintiffs were justified in relying on Defendants' representations when they accepted the investment advice to invest in the Cloth Offering because Defendants were either registered broker and possessed superior knowledge and skill.

206.    As a result of the reliance on Defendants representations and lack of any investigation, Plaintiffs and the Class have suffered financial losses totaling at least $20,000,000.

207.    Pursuant to Section 33(D) of the TSA, the Plaintiffs and the class as purchasers of securities, may rescind any securities transaction effected in violation of Section 33 of the TSA.

208.    Section 33(F) of the TSA, imposed joint and several liability upon the issuer, controlling person, and dealer; and each dealer or salesperson who participated or aided in any way in making the sale.

<u>**COUNT III**</u>
**Unjust Enrichment**

209.   Plaintiffs, individually and on behalf of the Class, restate and reallege paragraphs 1 through 181 as though fully set forth herein as paragraph 209.

210.   Maraboyina received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

211.   Maraboyina benefitted from negligently misrepresenting the nature and value of the Plaintiffs' investment and Cloth's gross fraud.

212.   Maraboyina benefitted from concealing their own suspicions of fraud so long as they continued to reap the benefit of Cloth's fraudulent scheme.

213.   Plaintiffs and the Class conferred a benefit on Maraboyina by paying excessive interest on fraudulent investments.

214.   It is inequitable for Maraboyina to retain these benefits.

215.   Plaintiffs and the Class were not aware of the true facts about the investment and did not benefit from Maraboyina's conduct.

216.   Maraboyina knowingly accepted the benefits of its unjust conduct.

217.   As a result of Maraboyina's conduct, the amount of their unjust enrichment should be disgorged in an amount according to proof.

WHEREFORE, Plaintiffs, individually and on behalf of the Class as defined herein, respectfully request that this Court enter a judgment against MARABOYINA CAPITAL, LLC and SURAJ MARABOYINA and in favor of Plaintiffs and the Class, and grant the following relief:

A. Determine that this action may be maintained and certified as a class action on a nationwide, statewide, and/or multistate basis under Rule 23(b)(1), 23(b)(2) and/or 23(b)(3); or alternatively, certify all questions, issues and claims that are appropriately certified under 23(c)(4); and that it designate and appoint Plaintiffs as Class Representatives, and appoint Class Counsel under Rule 23(g).

B. Award Plaintiffs and Class members their actual, compensatory and/or statutory damages, according to proof;

C. Award Plaintiffs and Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

D. Award Plaintiffs and Class members such other, further and different relief as the case may require; or as determined to be just, equitable, and proper by this Court.

Respectfully Submitted,

By: _/s/ Ross M. Good_____
        One of Plaintiff's Attorneys

Ross M. Good, Esq.
Alexander Loftus, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark Suite 1600
Chicago, Illinois 60601
p: 312.899.6625
ross@loftusandeisenberg.com
alex@loftusandeisenberg.com