**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| CASEY OAKS and JAMES MORMILE individually and on behalf of a class of similarly situated investors, | § § § § | |
| Plaintiff, | § | CIVIL ACTION NO.  3:23-cv-02833 |
| | § | |
| v. | § | |
| | § | |
| SURAJ MARABOYINA, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of class members described below, by and through their undersigned attorneys, and for their Complaint against Defendant, SURAJ MARABOYINA, state as follows:

**I.**
## NATURE OF ACTION

1.     Suraj Maraboyina   ("Maraboyina") was at all times relevant a Registered Investment Adviser who owed fiduciary duties to his clients. The statements for the investments at issue in this case indicated he was the Adviser assigned.

2.     Jason Cloth is a movie producer and principal of two bankrupt entities. Cloth purported to raise money for specific movie projects but instead commingled all the invested funds and moved money from entity to entity without any regard for what was agreed to with investors. At some point in or about 2021 the scheme turned Ponzi and in 2023 it went bankrupt.

3.     Hollywood loves sequels and so do Jason Cloth ("Cloth") and Aaron Gilbert ("Gilbert"). In the late 2010's Cloth's business partner Gilbert benefitted from another film Ponzi Scheme called Crystal Wealth that victimized thousands of Canadian investors. The Crystal

Wealth scheme ended with a soft landing for Gilbert and a huge settlement from Crystal Wealth's auditor for not realizing the Ponzi Scheme sooner. Right about when Crystal Wealth was cratering, Creative Wealth came in and took up the mantle with Gilbert and engaged in the same practices with new investors, this time in America.

4.      Since approximately 2021 Cloth does not pay investors on profitable projects, makes lulling payments on unprofitable projects to select investors, and repeatedly misrepresents facts in order to induce investment and keep investors at bay while maintaining his lavish lifestyle.

5.      Maraboyina served as the de facto placement agent or broker for Cloth in America, Maraboyina held himself out as a fiduciary for investors and sold dozens of individuals on the lies told by Cloth.

## II.
## PARTIES

6.      Plaintiff, Casey Oaks ("Oaks"), is, and at all times relevant to this action, has been a citizen of the state of Florida and domiciled in Florida.

7.      Plaintiff, James Mormile ("Mormile"), is, and at all times relevant to this action, has been a citizen of the state of California and domiciled in California.

8.      Defendant, Suraj Maraboyina ("Maraboyina"), is an individual and at all times relevant to this action, has been a citizen of the state of Texas and domiciled in Dallas County, Texas.

## III.
## JURISDICTION AND VENUE

9.      Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

10.      This is a class action. Members of the proposed Plaintiff Class are citizens of states different from Maraboyina's home state.

**AMENDED CLASS ACTION COMPLAINT**                                        **Page 2**

11.    Aggregate claims of individual Class Members exceed $5,000,000, exclusive of interest and costs.

## IV.
## FACTS COMMON TO ALL COUNTS

### A.  Suraj Maraboyina's Role in the Scheme

12.    Suraj Maraboyina was an Investment Adviser who passed a series 65 Examination.

13.    Maraboyina's focus throughout was selling and managing alternative investments for high net worth individuals and families.

14.    Maraboyina was a representative of Creative Wealth Media Finance Corp. ("CWMF") selling investment to wealthy individuals in the United States.

15.    Maraboyina came to know Oaks via a shared personal trainer. Maraboyina told Oaks about his great financial success with the movie Joker with Gilbert and proceeded to wine and dine Oaks.

16.    Maraboyina told Oaks the investment was low risk.

17.    Maraboyina told Oaks that Maraboyina himself invested as did his close family and Oaks should trust Maraboyina's should trust Maraboyina's judgment and investigation when choosing to invest with the foreign business.

18.    Maraboyina told Oaks that he did his own due diligence on Cloth and Creative Wealth.

19.    Maraboyina told Oaks that Creative Wealth had a track record of paying investors for its many successful productions.

20.    Maraboyina did not tell Oaks that he was paid a fee based on the amount of money he raised for Creative Wealth.

21.    Maraboyina came to know Mormile via a shared acquaintance that Maraboyina mentored at his alma mater.

22.     Maraboyina told Mormile the investment was low risk.

23.     Maraboyina told Mormile that Maraboyina himself invested as did his close family and Mormile should trust Maraboyina's judgment and investigation when choosing to invest with the foreign business.

24.     Maraboyina told Mormile that he did his own due diligence on Cloth and Creative Wealth.

25.     Maraboyina told Mormile that the proceeds of his investment into an individual picture were easily tracible.

26.     Maraboyina told Oaks that Creative Wealth had a track record of paying investors for its many successful productions.

27.     Maraboyina did not tell Oaks that he was paid a fee based on the amount of money he raised for Creative Wealth.

28.     Maraboyina wined and dined Mormile and took him out to lunch with Cloth at the Peninsula in Beverly Hills.

29.     Cloth had a rare Patek Philippe Aquanaut watch worth $500,000 delivered to him at the table during lunch in order to demonstrate his success to his potential investors.

30.     Maraboyina was taken hook, line, and sinker by Cloth and wanted to be a Hollywood producer himself.

31.     Upon information and belief, Maraboyina was paid thousands of dollars in transaction based fees at the time of each class member's investment.

32.     In or about January 2023 Maraboyina formed Maraboyina Capital to manage the investment in projects produced by entities controlled by Cloth.

33.     Maraboyina told investors:

I hope that you are having a good start to the New Year. I wanted to share with you that we have started our own investment firm, Maraboyina Capital (MarCap), based out of Dallas, Texas. The US-based team that you have been working with for the

last 4+ years will make up the new firm. As we move forward, all future projects will be under the MarCap banner, but we will be continuing to work with CWM/BRON Studios on the repayment of all past/existing projects. We are working with Finalis, who is our new SEC-registered BrokerDealer, for all investments moving forward, and will include more information on this relationship in the near future.

34.    Maraboyina claims on his website:

Welcome to Maraboyina Capital, your trusted partner in media finance. We understand that financing and investing in the media industry can be a complex and challenging process. That's why we're here to simplify it for you. Our team of experts has a wealth of experience in media finance and a deep understanding of the industry to help you make informed decisions and achieve your financial goals. Whether you're an established studio or an investor, we're here to provide you with tailored solutions to fit your unique needs.[1]

As the President and CEO, Suraj Maraboyina brings a unique blend of expertise as both a Media Financier and Executive Producer. With a wealth of experience and a proven track record of success, Suraj is well-equipped to help clients navigate the complexities of the media industry and achieve their financial goals through innovative and creative solutions.
Suraj and his team have raised over $100M into film and television projects over the course of the last few years.

35.    All of the productions Maraboyina raised money for but one, according to IMDB[2], were with Bron or Creative Wealth.

**B. Cloth's Fraudulent Scheme**

36.    Cloth is an individual who resides in Florida. Cloth is the owner and control person of Creative Wealth Media Finance Corp. and several related entities.

37.    CWMF is a corporation incorporated under the laws of Ontario, Canada, with its principal place of business in Toronto, Canada. CWMF is a citizen of Canada.

38.    CWMF is a pass through entity with no assets.

---

[1] https://www.maraboyinacapital.com/ (last accessed December 21, 2023).
[2] https://www.imdb.com/name/nm11476186/?ref_=nv_sr_srsg_0_tt_0_nm_8_q_Maraboyina (last accessed December 21, 2023).

39.     On its website, CWMF describes itself as "a prolific film and television financing company that has executive produced over 50 movies, while raising and deploying in excess of $650 million for a portfolio of critical hits, commercial blockbusters and cult favorites."

40.     CWMF is the primary financier for BRON Studios, defined below since Crystal Wealth was shut down by regulators.

41.     Cloth is the founder of CWMF and serves as its managing director. Cloth is also the co-founder of BRON Creative, as described below, and Cloth owns 15% of Bron at all times relevant.

42.     BRON Studios, Inc. is a corporation incorporated under the laws of the Province of Vancouver, Canada, with its principal place of business in Vancouver, British Columbia.

43.     Except where otherwise noted, BRON Studios USA, Inc. and BRON Studios, Inc. are referred to together herein as "BRON Studios." Bron Studios is controlled by Aaron Gilbert and Jason Cloth.

44.     Cloth was a director of Bron at all times relevant.

45.     Bron and Gilbert were previously involved in another Canadian Ponzi Scheme called "Crystal Wealth" and portentously referred to as "CWMF".

46.     Creative Wealth follows the name and business model of Crystal Wealth and was operated by Clayton Smith ("Smith").

47.     Throughout the late 2010's Smith produced movies alongside Cloth including "The Childhood of a Leader".

48.     As of 2017, Crystal Wealth claimed to have $193 million under management that were for the most part invested in Aaron Gilbert's Media House Capital and used to fund Bron productions. Crystal Wealth operated as a Ponzi Scheme premised on funding big budget film projects.

49.     After an Ontario Securities Commission ("OSC") investigation and insolvency proceeding, Crystal Wealth's principal, Smith escaped with a fine that was never paid and Gilbert and Bron were allowed to continue with their operations and repeat the scam with a new "CWMF".

50.     Ultimately Crystal Wealth's auditor, BDO, bore the brunt of the many unpaid investors and settled for tens of millions of dollars.

51.     Right when Crystal Wealth was cratering in bankruptcy and securities enforcement actions, Bron was making millions with its new partner Creative Wealth on the movie Joker.

52.     C2 Motion Picture Group, LLC ("C2") is a Delaware Limited Liability Company operated by Cloth and Dave Kaplin.

53.     C2 was formed on May 5, 2022, just as CWMF and Bron were defaulting.

54.     Cloth raised tens of millions of dollars in the United States for several pictures and series from approximately 2019 through 2023 on behalf of Bron, CWMF, and now C2.

55.     Cloth raised the bulk of the American investment via three intermediaries or brokers, Sanford Schmidt ("Schmidt") , Maraboyina, and Hudson Valley.

56.     Maraboyina's compensation from CWMF was not disclosed, but upon information and belief he received a fee of approximately 3% of each investment.

57.     Maraboyina was later named an executive producer and upon information and belief well compensated for that role.

58.     Cloth's scheme was complicated and appears that it did not matter what project an investor supposedly invested in and instead Cloth just paid who he felt he needed to in order to keep the scheme going.

59.     Investors would each be promised repayment based on the success of specific film projects.

60.     Investors were promised that they would be paid if the project was profitable and accepted the risk that they would not be paid if it was not profitable.

61.    Investors were led to believe that they had a direct interest in the project and the success or failure of the investment only depended on the profits of the project.

62.    Investors were assured that each project was thoroughly analyzed and would be successful.

63.    Contrary to the promises made, Cloth would pay whatever he felt like whenever he felt like regardless of the success or failure of the project invested in.

64.    Upon information and belief, a significant portion of the money invested was consumed by Cloth and his salesmen but never actually invested in film production.

65.    Cloth would invest in movies via various entities, but the repayments made to investors had little relation to what they purportedly invested in.

66.    Cloth would pay out on investments in failed projects when it suited his needs to keep an investor engaged.

67.    Cloth would not pay investors on successful projects when it did not suit his needs to keep that particular investor paying.

68.    At times, investors would be promised payment based on the success of projects they did not even invest in.

69.    CWMF and Bron had no internal controls, audits, or any structure in place to ensure the invested funds went where they were promised to go. The lack of auditing is the only material difference between Creative Wealth and Crystal Wealth.

70.    Cloth's scheme of misrepresentations and robbing profitable ventures to make Ponzi payments on others is best illustrated with a handful of specific projects:

**i.    Ghostbusters: Afterlife**

71.    On or about December 18, 2018, Bron Creative, the joint venture between Bron Studios and CWMF, closed a multi-picture, $100 million co-financing deal with Warner Bros. that included investment in Ghostbusters: Afterlife ("Ghostbusters").

72.     Maraboyina was instrumental in raising funds for Ghostbusters and on April 4, 2020, Cloth gave him the Executive Producer Credit for Ghostbusters.

73.     The Executive Producer title is not just an honorific. It's a straight line to payment. The total amount available as executive producer compensation for each film is generally fixed at the time the budget is determined. Each executive producer then earned their portion of the budgeted executive producer compensation based on the amount that they raised for the film.  In the case, the executive producers of Ghostbusters would have been paid close to $1,000,000.

74.     Ghostbusters was a huge financial success. Its budget was only $75 million, and it made $204 million at the box office alone following its release on November 19, 2021.

75.     Despite the huge success, investors were not paid.

76.     On June 15, 2022, Maraboyina emailed Mormile:

"I wanted to give you an update on Ghostbusters. We received the first studio ultimate in January, and then recently received the second one (numbers as of 3/31/2022). Profit is continuing to increase, and the next studio ultimate will come out at the end of June. I have attached the first ultimate and a screenshot of the most recent one is attached below. We will be financing repayment based upon the next ultimate. Full repayment is expected within the next 30-60 days. I appreciate your patience as this project was delayed, but I think you will be very happy with the final return. If you have any questions, please let me know"

77.     On August 26, 2022, Maraboyina emailed Mormile:

Good afternoon. I hope that you are doing well. We just received an update on the Ghostbusters repayment, and I wanted to keep you in the loop as to timing and when to expect a wire. We are working with BRON and Comerica for the line of credit that will allow us to repay principal, interest, and an initial tranche of profit as quickly as possible.
BRON and Sony have signed off on all documents and have send everything to Comerica. They are establishing a separate facility for this one transaction and not putting it through their general line of credit. While beneficial - no cross-collateralization risk for investors and straight forward reporting - it still requires a few more steps to establish than putting the studio ultimates through our existing line. BRON just received a new ultimates report from Sony that will provide for additional funds to be pulled through the facility. They have additionally already received approximately 90% of the value of the tax credits on the film, so future tax credit receipts will not have a material effect on the amount available through the refinancing. **Comerica will provide all the loan documents as well as work**

with Sony to get any third-party documents sorted. **Sony needs to execute an NOA with Comerica confirming the agreement to provide financial information directly to Comerica and several other covenants that are specifically negotiated**. BRON got ahead of this and this document is substantially negotiated at this point. In addition to the loan documents and the Sony agreement, there are several other documents, for example, certificates of insurance from Sony, that we are working on obtaining now to ensure a quick closing. That said, **a realistic timeframe from this point forward is three to four weeks. We are doing everything we can to push Comerica to move faster than this, but I wanted to give you an estimate.**

78.    On September 15, 2022, Maraboyina emailed Mormile: "Ghostbusters repayment

is imminent, so we will have that out in the next few business days."

79.    On September 21, 2022, Maraboyina emailed another investor:

**We just received an update on the Ghostbusters repayment**, and I wanted to keep you in the loop as to timing and when to expect a wire. **We are working with BRON and Comerica for the line of credit that will allow us to repay principal, interest, and an initial tranche of profit as quickly as possible.**

BRON and Sony have signed off on all documents and have send everything to Comerica. They are establishing a separate facility for this one transaction and not putting it through their general line of credit. While beneficial - no cross-collateralization risk for investors and straight forward reporting - it still requires a few more steps to establish than putting the studio ultimates through our existing line....
Comerica will provide all the loan documents as well as work with Sony to get any third-party documents sorted. Sony needs to execute an NOA with Comerica confirming the agreement to provide financial information directly to Comerica and several other covenants that are specifically negotiated. BRON got ahead of this and this document is substantially negotiated at this point.

In addition to the loan documents and the Sony agreement, there are several other documents, for example, certificates of insurance from Sony, that we are working on obtaining now to ensure a quick closing.

That said, **a realistic timeframe from this point forward is 5-7 business days**. We are doing everything we can to push Comerica to move faster than this, but I wanted to give you an estimate

80.    On October 4, 2022, Maraboyina emailed Mormile:

"I spoke with Arron this morning **and we are waiting on funds from Comerica which will then be transferred to BRON and then to CWM.** We are expending

this any day now. I know the delay has been frustrating for everyone; I following up daily with Aaron Gilbert and his team"

81.    On October 28, 2022, a Maraboyina employee emailed Mormile:

"We have a checklist call with Akin (bank's counsel) today but we don't have that far to go to get to a closing on Ghostbusters. Because it's being pulled from our general line of credit, we'll need Union's approval and a few other issues need to be addresses, but the action loan itself is quite advanced and I don't see other issues causing any material delays...."

82.    On February 16, 2023, Cloth emailed Maraboyina: "we are expecting $ right now within days."

83.    On February 19, 2023, Cloth emailed Maraboyina: "26% and it will be in next week."

84.    Cloth told another investor Bron received 33% of the profits.

85.    Mormile was never paid anything for his Ghostbusters investment.

86.    Maraboyina never investigated why a line of credit would be necessary to pay the proceeds of the investment.

87.    Plainly, Cloth promised more returns than he could satisfy and Maraboyina was oblivious to the inner workings of the scheme he was promoting.

88.    Another investor was repaid less than half his principal invested in Ghostbusters, and payment came from an entity called Shaggy Dog Media that was not disclosed in any investment documents.

89.    In July 2023, Cloth said another large investor was paid on Ghostbusters.

**ii. Monkey Man**

90.    CWMF and Bron produced the Dev Patel movie, Monkey Man. It was produced at a total expense of $10,500,000 and then sold to Netflix for $34,000,000.

91.    Monkey Man was a huge success.

**AMENDED CLASS ACTION COMPLAINT**                                        **Page 11**

92.     Oaks invested $250,000 on or about October 25, 2020, another $100,000 on November 6, 2020, and another $94,0000 on March 12, 2021.

93.     Cloth claimed that Creative Wealth actually received 25% of Monkey Man's net profits in compensation for a $6,500,000 loan.

94.     Further, Creative Wealth had registered a charge on Kid Unknown Holdings Ltd., the production company for the Monkey Man project, on or about March 30, 2021 and that this charge was satisfied on or about August 6, 2021. In other words, it appears as though Creative Wealth received monies in connection with the Monkey Man project over two years ago, yet has failed to pay anything to investors.

95.     On September 7, 2022, Maraboyina emailed Oaks:

Netflix has the film and editing is complete. BRON is finalizing everything with Netflix's lawyers, and we expect everything to be completed in the coming weeks. Netflix will be paying BRON starting at the end of the year, but CWM is going to be paying investors in the next month or so with other funds.

96.     On October 10, 2022, Maraboyina gave an interview for a podcast with his alma mater wherein he explained that Monkey Man was his greatest financial success in film production.

97.     Despite the success of Monkey Man, Oaks and the class were not paid on their investment in the project.

### iii. Shadowplay

98.     On or about March 19, 2020, Oaks invested in financing episodes 101-108 of the series Shadowplay.

99.     Oaks also entered into a participation agreement that provided:

Financier shall participate in the Collections and be repaid principal and interest and share in "Adjusted Gross Revenues" derived from exploitation of the Picture, on and subject to the terms provided in Schedule "A" to the extent of its Participation.

Lender agrees to pay and otherwise account to Financier on or about fifteen (15) calendar days after Lender's actual receipt of amounts due and payable to Lender

pursuant to the Financing Agreements, amounts due and payable to Financier, pursuant to the Client Term Sheet in respect of the Participation, as such amounts are earned and paid by the Borrower to Lender, pursuant to the terms of the Financing Agreements

100.    On July 16, 2020, Cloth entered into term sheet for another loan for the same

project with the same terms with Hudson, LP.

101.    On December 9, 2020, Maraboyina emailed Oaks:

The production risk isn't an issue for any of your investments. Digital Animation will be sold within a couple of months. Shadowplay repayment is scheduled for February.

102.    On March 4, 2021 Oaks texted Maraboyina:

Q: Hey do you have any update on Shadowplay repayment?
A: Will have an update from BRON by end of the day today.

103.    On April 16, 2021, Maraboyina emailed Oaks:

Casey, I hope that you are doing well. I wanted to get back to you regarding an update on Shadowplay. The sale to Netflix is being finalized right now but has been delayed several weeks as a result of..."

104.    Oaks told Maraboyina that he could invest more as soon as Shadowplay paid off.

105.    On February 2, 2022, Oaks' investment in Shadowplay miraculously paid off right

in time for Oaks to invest in National Anthem.

106.    Oaks made $298,195.48 on the $250,000 investment in Shadowplay.

107.    Oaks' payoff on Shadowplay had nothing to do with the success of the investment

and everything to do with his willingness to rollover the investment into another project.

108.    Cloth stated in affidavit filed on December 16, 2022 in SDNY 1:22-cv-05520:

[Shadowplay] was not successful as Creative Wealth had hoped, and Shadowplay did not generate sufficient gross receipts to pay Hudson. Therefore, no amount is due and owing to Hudson, from Creative Wealth or anyone else" (affidavit exhibit) "repayment of those outstanding amounts was conditioned on Shadowplay's generation of sufficient receipts."

109.    The same terms for the same investment yielded a 20% profit for one investor while another investor received nothing on the same purportedly failed project.

**iv. Gossamer**

110.    Oaks and the Class invested in two failed projects Fables and Gossamer.

111.    Both projects were complete failures and nothing was paid.

112.    On June 3, 2022, Oaks invested in Gossamer.

113.    On June 16, 2022, Maraboyina told Oaks that CWMF renegotiated the deal with Bron and was now getting 40% of the profits on Gossamer.

114.    On January 27, 2023, Cloth communicated to Schmidt in Illinois:

I've been asked to provide a further update on the initial financial exit from the various film / TV productions financed by all of you. Firstly, and I cant stress this strongly enough, there is zero risk of non repayment. **All the shows, except for Bear Grylls (that deal is being worked on now) are sold and have sold for far in excess of production cost**. I think Ive stated this before, film finance is very much akin to a first lean construction finance loan. Other then the first 10-15% of monies received, we are always the first party to be repaid with interest. Just like construction, the purchaser of the property does not "close" until the project is delivered as substantially complete. That is exactly the same mechanic in film at tv finance. We have multiple, non related productions contained within a fund and a few one off productions that sit exclusive to the media fund. Delivery of all of these shows will occur anywhere from a few months from now to 18-24 months from now. If we waited for delivery and payment from the studios / distributors repayment would be irregular and very choppy. I found over the years that didn't sit well with clients and caused needless angst to clients. **Aaron Gilbert and myself took it upon ourselves to put in place a credit facility which allows us to take deal paper and bring forward the cash value. That value is to exclusively be used to repay clients from the underlying deals. To get to that point all 26 agreements on all 9 shows need to be legally reopened and Comerica inserted as a party to the transaction**. Once new docs are drafted, they must be sent to the legal council of every party connected to each show for review and comment. Once everyone has agreed to all of the new docs they have to go out for wet ink signatures. **Once all the wet ink is back at Comerica, closing is arranged (usually within 48 hours) and funds are transferred to our collection account for distribution to clients. Closing a bank facility for 1 show is heavy work, 9 is enormous**. Covid played a role in slowing the lawyers work in Dec and early Jan, but things are rolling along now. I've told Sandy this on numerous occasions that there are probably 100 people working to push all parties

to review, comment, sign, and execute documents as soon as possible. I cant push people any harder. They will stop taking my call. We are all at the end here. **I anticipate funds closing very shortly, as a matter of fact I'm being told imminently. The payments being processed now will allow for full exits with all outstanding interest.** Further profit participation will provide investors with returns well above 100%. Future revenues will include; merchandise, gaming, publishing, music, digital strategies (nft). You all will make money for years to come from there shows. For further comfort (and please do not share any of this info with anyone outside our group), I am going to give out the purchase details for each show. For clarification though, I must admit that I don't have all of the waterfalls yet (those are being prepared) so I cant quite calculate the exact quantum of profit owed to us per project. Also please remember that we are only one of many parties entitled to profit participation.

**Monkey Man**
 10,500,000cost
Netflix  33,000,000 purchase price

**Hailey and the Hero Heart**
2,775,000 (CW Loan)
Warner Brothers (Cartoon Network)  3,650,000 (only for North America)
The rest of the world is being sold now

**Bubbles Hotel**
5,500,000 (CW Loan)
Warner Brothers (Cartoon Network)   8,700,000 purchase price

**Fables**
10,500,000 cost
Netflix (North America) Paramount + (Rest of World)
17,000,000 purchase price

**Gossamer**
10,800,000 cost
Netflix (North America) Paramount + (Rest of World)
18,700,000 purchase price

**Robin Hood**
 In production

Bear Grylls Corporate have agreed to post a corporate guarantee of our loan. That guarantee is being financed with our Comerica line as well. Clients will revieve their investment plus outstanding interest. A distribution deal is being worked on now, and I should have further details shortly to share with you.

As always, I don't take it lightly that you have all entrusted me with your hard earned money. We are always very careful to select shows that we identify as those with the greatest return potential that can survive in all market conditions. I know you will all be happy and impressed with the total return performance of these first few shows.

115.    Cloth told Schmidt that Gossamer was already sold but didn't pay Oaks anything for his investment in it.

116.    Cloth's favorite lie to deploy when in a bind is that a Comerica line of credit will soon come save the day and neither Schmidt nor Maraboyina bothered to confirm there was actually a line of credit or that it would be used to pay investors.

## C.  Bron Bankruptcy

117.    On July 10, 2023, Cloth spoke to a group of investors in Illinois about the Bron bankruptcy.

118.    Remarkably, Cloth attributed all the failures and investment losses to Bron despite the fact that he was an owner and director of Bron.

119.    Cloth said the cause of the bankruptcy was "it's financial mismanagement" and that "we haven't worked with Bron in a about a year and a half."

120.    He claimed CWMF had nothing to do with it and no liability because "we are a flow through entity."

121.    Cloth claimed, "we know that there is value in other investments Bron made" and that C2 agreed to pledge its share to a bank for a line of credit to repay the Bron and CW investors.

122.    Just like he did years earlier, Cloth claimed Comerica would come to the rescue and "credit facility will be in place within 90 days" and "we [C2] will pull revenue forward to pay off those notes".

123.    Cloth boldly claimed that CW and Bron investors would be paid soon based on the success of C2's investment in Mission Impossible.

124.    Cloth claimed in July 2023 that was a 100% likelihood that he would repay the notes to the Illinois within 110 days of July 10, 2023.

125.    The Comerica line of credit was made up. Just like before.

126.    Mission Impossible, while a huge production was not profitable, and Paramount lost $40,000,000 on the production.

127.    C2 is not listed on IMBD as a producer of Mission Impossible.

128.    On June 21, 2024 judgment was entered following a jury trial in the Southern District of Florida for fraud against Jason Cloth including $6,573,024 in actual damages and $13,000,000 in punitive damages based on the same misrepresentations about the same projects alleged herein.

**D.  Maraboyina's Ignorant Participation in the Scheme**

129.    Cloth raised money in the United States via three principal firms who acted as placement agents selling notes for investment, including Maraboyina, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in promissory notes and co-investment agreements used to fund individual projects offered by Cloth (hereinafter "Cloth Offering").

130.    On March 14, 2024, the Securities and Exchange Commission entered a cease-and-desist Order against Cloth's first American Middle-Man, Christopher Conover and his firm Hudson Valley Wealth Management, Inc. based on the same acts and omissions alleged herein against Maraboyina. (Order attached hereto as Exhibit "A" and incorporated herein)

131.    Cloth's scheme was a house of cards and an iota of due diligence by the middleman earning the commissions would have demonstrated this investment was not safe for anyone.

132.    Maraboyina relied on personal relationships and word-of-mouth referrals to obtain investors.

133.    Maraboyina typically solicited investors in person, over the telephone, and via email for the Cloth Offering.

134.    Maraboyina solicited over $100,000,000 in investment for the Cloth Offering of which approximately $60,000,000 remains outstanding.

135.    Assuming Maraboyina was paid at the same rate his contemporary in New York was, Maraboyina's finders fees and executive producer fees exceeded $3,000,000.

136.    None of Maraboyina's compensation was disclosed to investors.

137.    Maraboyina was Cloth's salesmen and broker raising money for Cloth throughout the United States.

138.    Maraboyina negligently relied on only representations from Cloth when recommending the investment to Plaintiffs and the Class rather than confirming anything with third parties or looking into Bron or CWMF's finances.

139.    The capital deployed by Maraboyina was provided by Plaintiffs and the Class.

140.    During this time, Cloth made representations and provided purported contracts, emails, and other information to Maraboyina, which Maraboyina negligently believed to be true and accurate without investigating the obvious holes in the story that was far too good to be true.

141.    Maraboyina proceed to sell Plaintiffs and the Class investments in the Cloth Offering by regurgitating the lies told by Cloth.

142.    Maraboyina acted as the gatekeeper of information from Cloth.

143.    Plaintiffs and the Class reasonably relied on Maraboyina's due diligence on the investment and representations that they were actually investing in specific projects rather than Cloth's personal piggy bank.

144.    Rather than relying on any substantive investigation of its own, Maraboyina relied on the fact that Cloth kept paying as sufficient evidence that the apparent Ponzi Scheme was legitimate.

145.    Maraboyina was taken hook, line, and sinker by Cloth and did not bother to do his own independent due diligence when promoting the Ponzi Scheme.

146.    Maraboyina kept his head in the sand so long as the lulling payments kept coming in from Cloth.

147.    After the defaults Maraboyina admitted to investors he was in the dark on how Cloth's scheme operated and where the invested funds went.

148.    Maraboyina admitted to no understanding the investment he sold and its relationship with the previous Ponzi Scheme.

149.    Maraboyina admitted he did not know that CWMF was in litigation in Canada relating to Class members investments at the time they invested.

150.    Maraboyina further admitted to eventually discovering the underlying fraud that he knew or should have known about prior to the investment.

151.    Maraboyina said he was in communication with Schmidt trying to coordinate what his investors were being paid on.

152.    On October 20, 2023, Maraboyina stated "If I walk into any FBI/Justice Department and he's toast and he knows that" and "Jason [Cloth] knows he has a gun to his head".

153.    On October 31, 2023, Maraboyina stated in a phone call to a class member "[Cloth] either takes care of it or he's going to jail, he knows I will fuck him... he knows I'd testify against him, he knows I would" and added "I'm not taking his [Cloths'] side at all".

**E.  Maraboyina's Duty to Plaintiff and the Class**

154.    For all intents and purposes, Maraboyina was acting as a placement agent or broker for Cloth and paid to per transaction to sell to his Investment Advisor clients.

155.    Plaintiffs and the Class reasonably relied on Maraboyina's representations and due diligence into Cloth because he was a registered Investment Advisor who passed a Series 65 Examination and operated as an independent Investment Advisor and he was later a Registered Representative of Finalis Securities LLC Member FINRA/SIPC

156.    In the Advisers Act, Congress recognized that investment advisers have a fiduciary relationship with their clients. *See Securities & Exchange Comm'n v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191, 194, 84 S. Ct. 275, 11 L. Ed. 2d 237 (1963); *Nat'l Ass'n of Priv. Fund Managers v. Sec. & Exch. Comm'n*, 103 F.4th 1097, 1103 (5th Cir. 2024)

157.    Placement agents such as Maraboyina who sell private placements to retail customers for a commission, such as Maraboyina, are required to register with the Financial Industry Regulatory Authority ("FINRA").

158.    FINRA regulates broker/dealer firms like Maraboyina and their registered representatives (*i.e.*, stockbrokers), and promulgates rules and regulations that brokerage firms and their registered representatives must adhere to.

159.     Maraboyina was required to perform reasonable due diligence on a private placement prior to offering it for sale to its customers pursuant to FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26, 17 C.F.R. § 240.15l-1(b)(1).

160.     SEC Regulation Best Interest ("Reg BI") provides Maraboyina owed the following duties to Plaintiff and the Class:

> (ii) Care obligation. The broker, dealer, or natural person who is an associated person of a broker or dealer, in making the recommendation, exercises reasonable diligence, care, and skill to:
> (A) Understand the potential risks, rewards, and costs associated with the recommendation, and have **a reasonable basis to believe that the recommendation could be in the best interest of at least some retail customers**;
> (B) **Have a reasonable basis to believe that the recommendation is in the best interest of a particular retail customer based on that retail customer's investment profile and the potential risks**, rewards, and costs associated with the recommendation and does not place the financial or other interest of the broker, dealer, or such natural person ahead of the interest of the retail customer;
> (C) Have a reasonable basis to believe that a series of recommended transactions, even if in the retail customer's best interest when viewed in isolation, is not excessive and is in the retail customer's best interest when taken together in light of the retail customer's investment profile and does not place the financial or other interest of the broker, dealer, **or such natural person** making the series of recommendations ahead of the interest of the retail customer.

(17 C.F.R. § 240.15l-1(b)(1).)

161.     In order to ensure that it has fulfilled its responsibilities, FINRA requires that a broker-dealer in a Regulation D offering must, at a minimum, conduct a reasonable investigation concerning:

    a.     the issuer and its management;

    b.     the business prospects of the issuer;

    c.     the assets held by or to be acquired by the issuer;

    d.     the claims being made; and

> e.     the intended use of proceeds of the offering.

162.    Maraboyina had a duty to conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer.

163.    FINRA has also provided detailed guidance on how a broker-dealer such as Maraboyina was acting with the Cloth Offering may ensure an adequate investigation has taken place into the issuer and its management, the issuer's business prospects, and the issuer's assets.

164.    As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Cloth and its history by Maraboyina would have included:

> a.     Examining historical financial statements of Cloth, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management;
>
> b.     Looking for any trends indicated by Cloth's financial statements;
>
> c.     Contacting customers and suppliers regarding their dealings with Cloth;
>
> d.     Reviewing Cloth's contracts, leases, and financing arrangements;
>
> e.     Inquiring about Cloth's past securities offerings and the degree of their success; and
>
> f.     Inquiring about the length of time that Cloth had been in business and whether the focus of its business was expected to change.

165.    This was not done here. The full extent of the investigation was reliance on information supplied by the apparent Ponzi Schemer. There was zero independent investigation done by Maraboyina.

166.    As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Cloth's business prospects by Maraboyina should include:

a.    Inquiring about the viability and value of any movies funded by Cloth;

b.    Inquiring about the industry in which Cloth operates, and the competitive position of Cloth; and

c.    Requesting any business plan, business model or other description of the business intentions of Cloth and its management and their expectations for the business, and analyzing management's assumptions upon which any business forecast is based. A broker/dealer should test models with information from representative assets to validate projected returns, break-even points, and similar information provided to investors.

167.    This was not done here. Instead, it is apparent that Cloth oversubscribed each investment and operated a Ponzi Scheme with the excess investment.

168.    Minimal investigation would have confirmed that the investments were oversubscribed and investors were getting paid with new investments rather than proceeds of the movies they supposedly invested in.

169.    As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Cloth's assets and facilities should include:

a.    Carefully examining any reports by third-party experts that may raise red flags;

b.    Obtaining an expert opinion from auditors and financial experts and others as necessary to form a basis for determining the suitability of the investment prior to recommending the security to investors;

c.    Inquiring about previous or potential regulatory or disciplinary problems of the issuer;

d.    Obtaining a credit check of Cloth;

e.    Making reasonable inquiries concerning the issuer's management. Maraboyina should have inquired about such issues as the expertise of management for the issuer's business and the extent to which management has changed or is expected to change;

f.    Inquiring about the forms and amount of management compensation, who determines the compensation and the extent to which the forms of compensation could present serious conflicts of interest. A party acting as a broker-dealer might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of the issue; and

g.    Inquiring about the length of time that the issuer has been in business and whether the focus of its business is expected to change.

170.    Maraboyina failed to do this third party confirmation of this supposedly nine-figure operation.

171.    A broker-dealer that offers securities, including those offered under Regulation D, must meet the suitability requirements of FINRA Rule 2111. This means that the broker-dealer must have a reasonable basis to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer.

172.    FINRA Rule 2111.05(a) is the source of a broker-dealer's obligation to perform a reasonable investigation of the issuer and offered securities before offering securities in a Regulation D for sale to its clients.

173.    Reasonable-basis suitability requires that a broker-dealer (1) perform reasonable diligence to understand the potential risks and rewards associated with a recommended security or

strategy and (2) determine whether the recommendation is suitable for at least some investors based on that understanding. A broker-dealer can violate reasonable-basis suitability under either prong of the test.

174.    Maraboyina could not rely blindly upon the issuer for information concerning a company, nor may it rely on the information provided by the issuer in lieu of conducting its own reasonable investigation.

175.    While broker-dealers like Maraboyina are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a high degree of care in investigating and independently verifying an issuer's representations and claims. The fact that a broker-dealer's customers may be sophisticated and knowledgeable does not obviate this duty to investigate.

176.    Of course, under these circumstances, Maraboyina was in a position to know more about Cloth, understand its business, its finances, and its outlook better than just a mere broker-dealer since it was acting as its placement agent or investment banker raising capital exclusively for Cloth.

177.    As the de facto placement agent and investment banker for Cloth, Maraboyina was in a unique position compared to another broker-dealer that was merely part of the investment banking syndicate.

178.    In the course of a reasonable investigation, a broker-dealer must note any information that it encounters that could be considered a "red flag" that would alert a prudent person to conduct further inquiry. A broker-dealer's reasonable investigation responsibilities obligate it to follow up on any red flags that it encounters during its inquiry as well as to investigate any substantial adverse information about the issuer. When presented with red flags, the broker-

dealer must do more than "blindly rely" upon representations by the issuer's management or the disclosure in an offering document.

179.    As described below, unfortunately for the Plaintiffs and the Class, Maraboyina failed to conduct proper due diligence, which caused Defendant's conduct to fall below the standard of care thereby breaching the duties that it owed the Plaintiffs and the Class.

## F.  Cloth Defaults

180.    The cascade of defaults and lawsuits starting in 2019 and culminated in two bankruptcy filings.

181.    In or about September 2022 the OSC interviewed several individuals involved in the scheme.

182.    On or about July 19, 2023, Bron filed for bankruptcy protection in Vancouver and a Creative Wealth entity offered to provide Debtor in Possession financing.

183.    On or about October 27, 2023, CWMF filed for bankruptcy protection in Ontario.

## G.  Plaintiffs' Investments Placed by Maraboyina

184.    Oaks was first sold on the Cloth Offering in early March 2020 and made the following investments that were not repaid:

      a.      March 5, 2020-Monkey Man- $250,000

      b.      May 14, 2020-Fables- $50,000

      c.      May 29, 2020-Bubble's Hotel-$50,000

      d.      June 26, 2020-Young Bear Grylls-$50,000

      e.      July 23, 2020-Hailey and the Hero Heart-$150,000

      f.      November 6, 2020-Monkey Man-$100,000

      g.      March 12, 2021-Monkey Man-$94,000

      h.        February 4, 2021-National Anthem-$250,000

      i.        May 12, 2022-Robinhood-$500,000

      j.        June 9, 2022-Gossamer-$500,000; and

      k.        July 15, 2022-Gossamer-$150,000

185.    All of the investments listed above were a total loss and to date, Oaks is owed over $3,400,000 from investments placed with Maraboyina.

186.    Mormile fortunately only invested in one project and invested $125,000 in Ghostbusters on July 29, 2019.

187.    Mormile's investment was a total loss.

188.    Plaintiffs justifiably relied on Maraboyina's representations about the suitability of investment in Cloth Offerings.

189.    Plaintiffs relied on Maraboyina to investigate the Cloth Offerings and confirm facts presented in the offering materials.

190.    Plaintiffs justifiably relied on Maraboyina's statements about the investment and that Maraboyina had a reasonable basis for recommending the investment.

## IV.
## CLASS ALLEGATIONS

191.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated, comprising a class consisting of:

*All persons who invested in Creative Wealth Media Finance Corp.'s projects offered by Maraboyina from January 1, 2019 to December 31, 2022.*

Excluded from the proposed Class are Defendant, his respective officers, directors, and employees, affiliates, legal representatives, heirs, successors, or assignees. Plaintiffs reserve the right to amend the Class definition as necessary.

192.    Plaintiffs are members of the Class.

193.    Excluded from the Class are judicial personnel involved in considering the claims herein, all persons and entities with claims for personal injury, the defendant, any entities in which the defendant has a controlling interest, and all of their legal representatives, heirs and successors.

194.    It is estimated that the Class consists of hundreds of persons throughout the continental United States. The members of the Class are so numerous that joinder of all members, whether otherwise required or permitted, is impracticable. The exact number of Class members is presently unknown to Plaintiffs, but can easily be ascertained from the sales and warranty claim records of Defendant.

195.    There are numerous questions of law or fact common to the members of the Class which predominate over any questions affecting only individual members and which make class certification appropriate in this case, including:

a.    Whether Defendant, owed an extra-contractual duty of ordinary care to Class Members;

b.    Whether Defendant, breached their duty of ordinary care to Class Members;

c.    Whether Defendant, was negligent to offer the Cloth Offering to Class Members;  and

d.    Whether Defendant was unjustly enriched.

196.    The claims asserted by Plaintiffs are typical of the claims of the members of the Class.

197.    This class action satisfies the criteria set forth in Fed. R. Civ. P. 23(a) and 23(b)(3) in that Plaintiffs are members of the Class; Plaintiff will fairly and adequately protect the interests of the members of the Class; Plaintiff's interests are coincident with and not antagonistic to those

of the Class; Plaintiffs have retained attorneys experienced in class and complex litigation; and Plaintiff have, through their counsel, access to adequate financial resources to assure that the interests of the Class are adequately protected.

198.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    a.    It is economically impractical for most members of the Class to prosecute separate, individual actions;

    b.    After the liability of Defendant has been adjudicated, the individual and aggregate claims of all members of the class can be determined readily by the Court; and

    c.    Litigation of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members that would substantially impair or impede the ability of other Class members to protect their interests.

199.    Class certification is also appropriate because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory and/or injunctive relief with respect to the claims of Plaintiffs and the Class Members.

**V.**
**<u>CAUSE(S) OF ACTION</u>**

**COUNT 1:    BREACH OF FIDUCIARY DUTY** (For Plaintiffs and Nationwide Class)

200.    Plaintiffs, individually and on behalf of the Class, restates and realleges paragraphs 1 through 199 as though fully set forth herein as paragraph 200.

201.    The elements of a breach of fiduciary claim are that (1) a fiduciary relationship between the plaintiff and defendant existed; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the

defendant. *See, e.g., Dernick Resources v. Wilstein*, 312 S.W.3d 864, 877 (Tex. App.—Houston [1st Dist.] 2009). Furthermore, "[a] fiduciary relationship imposes a duty on the fiduciary to render full and fair disclosure of facts material to the relationship giving rise to the duty." *See id*. Additionally, the discovery rule appears to apply to same.

202.    Maraboyina owed Plaintiffs and the Class a fiduciary duty as a Registered Investment Advisor as a matter of law. Furthermore, Maraboyina owed a fiduciary duty based on his superior knowledge and experience.

203.    Maraboyina, while serving as an investment advisor to Plaintiffs and the Class, breached his fiduciary duties of loyal, candor, and ordinary care to Plaintiffs as described in the paragraphs above, including but not limited to, as applicable:

a.    Failing to disclose his transaction-based fees on the investments placed in violation of 15 U.S. Code § 80b–6;

b.    Failing to disclose his compensation as executive producer in violation of 15 U.S. Code § 80b–6;

c.    Failing to disclose facts about the failure of the investments at issue;

d.    Failing to exercise ordinary care in due diligence of the Cloth Offering;

e.    Putting his own personal interest in transaction-based fees and executive producer compensation ahead of his clients' interest.

f.    Engaging or allowing in the engagement in non-arm's length transactions with Cloth without issuance of notice and/or obtaining Plaintiffs permission;

g.    Failing to provide the Plaintiffs or the Class with accurate financial data and financial statements; and

h.    Allowing investments into entities that were actively engaged in fraud (or at least not preventing such fraud, minimizing the impact of such fraud once it started, and/or advising the Plaintiffs and the Class of such fraud)

**AMENDED CLASS ACTION COMPLAINT**                                    **Page 30**

211.  The conduct described herein has proximately caused Plaintiffs to suffer actual and consequential damages, and pre-judgment and post-judgment interest as allowed by law.

**COUNT 2:**     **ASSUMPSIT** (For Plaintiffs and Nationwide Class)

212.    Plaintiffs, individually and on behalf of the Class, restates and realleges paragraphs 1 through 199 as though fully set forth herein as paragraph 212.

213.    Maraboyina received fees for each transaction he effectuated on behalf of the class and received fees based on his role of Executive Producer on Ghostbusters.

214.    The fees were earned based on Cloth's fraudulent conduct alleged herein and based on Maraboyina's breaches of fiduciary duty and negligence.

215.    The elements under Texas law to recover under an assumpsit cause of action are that:  (1) plaintiff paid money; (2) for the use and benefit of defendant; and (3) Defendants' use and retention of the benefit without repayment would be against the fundamental principles of justice and equity.  *See, e.g., Excess Underwriters at Lloyd's v. Frank's Casing Crew and Rental Tools, Inc*., 246 S.W.3d 42, 49 (Tex. 2008); *King v. Tubb*, 551 S.W.2d 436, 442 (Tex. Civ. App.— Corpus Christi 1977).

216.    Plaintiffs have pled facts which show that the Defendant has wrongfully and/or passively secured or received benefits which would be unconscionable for Defendant to retain, including without limitation (as applicable):

      a   Maraboyina received a fee from Cloth or entities he controlled for each investment;

      b   Maraboyina did not disclosed his compensation to the Class;

      c   Maraboyina earned the fees based on recommending investment into a Ponzi Scheme unsuitable for anyone to invest in;

d   Upon information and belief, Maraboyina earned a separate fee as Executive Producer on Ghostbusters while his clients were not paid on their investments in that film;

e   Upon information and belief Maraboyina was paid on investments that his clients were not paid on;

217.   Maraboyina has received benefits unjustly, and he should make restitution for those benefits. Defendant's use and retention of these benefits without repayment would be against the fundamental principles of justice and equity.

**COUNT 3:**   NEGLIGENCE (For Plaintiffs and Nationwide Class)

204.   Plaintiffs, individually and on behalf of the Class, restates and realleges paragraphs 1 through 199 as though fully set forth herein as paragraph 204

205.   To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry. In this case, the applicable standards of conduct for Maraboyina are the rules promulgated by FINRA which each broker offering securities such as the Cloth notes should be a member of.

206.   Those who undertake any work or calling for which a special skill is required such as a broker-dealer or investment advisor have a duty not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability.

207.   Defendant owed Plaintiff and the Class a duty to act as a reasonably prudent investment advisor or broker-dealer would do under the same or similar circumstances. The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by FINRA. These duties and obligations flow to Plaintiff and the Class members as a result of the client relationship between Maraboyina, the Plaintiff, and the Class.

208.    As set forth above, Defendant breached his legal duty to evaluate the suitability of the investment before offering it and earning a fee on it.

209.    Had a reasonably prudent broker-dealer under the same or similar circumstances conducted adequate due diligence on Cloth to understand the risks and rewards of the Cloth Offerings, it would have concluded that the risks in investing in Cloth far outweighed any potential reward, and it would not have approved of the Cloth Offerings for sale to any of its clients.

210.    By approving of the sale of the Cloth Offerings to its clients, notwithstanding the numerous red flags identified herein, Maraboyina demonstrated that he failed to understand the risks and rewards of the Cloth Offerings, or consciously ignored the risks presented by these red flags in order to ensure it maximized his fees.

211.    Maraboyina knew or should have known that Plaintiff and the Class would place their trust and confidence in him and that he had a reasonable-basis to conclude that the Cloth Offering was suitable for at least some investors, and that it had conducted adequate due diligence to understand the risks and rewards of the Cloth offering.

212.    Maraboyina knew or should have known that it was reasonably foreseeable that Plaintiff and the Class would act in reliance on Maraboyina's approval to sell the Cloth Offerings.

213.    Plaintiff and the Class acted in reliance on Maraboyina's approval to offer to sell the Cloth offerings.

214.    But for Maraboyina's approval to sell the Cloth Offerings, Plaintiffs or the Class members would not have even been presented the opportunity to participate in the Cloth Offerings.

215.    As a direct and proximate result of Maraboyina's negligence, he is liable to Plaintiff and the Class for all of the investment losses that they suffered in the Cloth Offering.

## VI.
## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the Class as defined herein, respectfully request that this Court enter a judgment against SURAJ MARABOYINA and in favor of Plaintiffs and the Class, and grant the following relief:

A. Determine that this action may be maintained and certified as a class action on a nationwide, statewide, and/or multistate basis under Rule 23(b)(1), 23(b)(2) and/or 23(b)(3); or alternatively, certify all questions, issues and claims that are appropriately certified under 23(c)(4); and that it designate and appoint Plaintiffs as Class Representatives, and appoint Class Counsel under Rule 23(g).

B. Award Plaintiffs and Class members their actual, compensatory and/or statutory damages, according to proof;

C. Award Plaintiffs and Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

D. Award Plaintiffs and Class members such other, further and different relief as the case may require; or as determined to be just, equitable, and proper by this Court.

## VIII.
## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all triable issues.

Date:  February 21, 2025          By:          *Alexander Loftus*

ALEXANDER LOFTUS, Esq.
*Admission Applied For*
**LOFTUS & EISENBERG, LTD.**
161 N. Clark Suite 1600
Chicago, Illinois 60601
Ph: 312.899.6625
alex@loftusandeisenberg.com

*- and -*

JAMES CREWSE, Esq.
Texas Bar No. 24045722
**CREWSE LAW FIRM, PLLC**
5919 Vanderbilt Ave.
Dallas, Texas 75206
Ph:  214.394.2856
jcrewse@crewselawfirm.com

**ATTORNEYS FOR PLAINTIFFS
AND THE PROPOSED CLASSES**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| CASEY OAKS and JAMES MORMILE individually and on behalf of a class of similarly situated investors, | § § § § | |
| Plaintiff, | § § | CIVIL ACTION NO.  3:23-cv-02833 |
| v. | § § | |
| SURAJ MARABOYINA, | § § | |
| Defendant. | § § § | |

# EXHIBIT "A"

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

INVESTMENT ADVISERS ACT OF 1940
Release No. 6603 / May 14, 2024

ADMINISTRATIVE PROCEEDING
File No. 3-21937

| | |
|---|---|
| In the Matter of<br><br>    HUDSON VALLEY WEALTH<br>    MANAGEMENT, INC., and<br>    CHRISTOPHER CONOVER,<br><br>Respondents. | ORDER INSTITUTING<br>ADMINISTRATIVE AND CEASE-AND-<br>DESIST PROCEEDINGS PURSUANT<br>TO SECTIONS 203(e), 203(f), AND 203(k)<br>OF THE INVESTMENT ADVISERS ACT<br>OF 1940, MAKING FINDINGS, AND<br>IMPOSING REMEDIAL SANCTIONS<br>AND A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") against Hudson Valley Wealth Management, Inc. ("Hudson") and Christopher Conover ("Conover") (collectively "Respondents").

II.

In anticipation of the institution of these proceedings, each Respondent has submitted an Offer of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over the Respondents and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

### Summary

1.      These proceedings arise out of breaches of fiduciary duty by registered investment adviser Hudson Valley Wealth Management, Inc. ("Hudson") and its principal, Christopher Conover ("Conover"), to Hudson's clients, including separately managed accounts (the "SMAs") and a private investment fund called Hudson Private, LP that invests in films (the "Fund"). Specifically, Hudson and Conover failed to disclose to a conflict of interest to clients and Fund investors (most of whom were Hudson advisory clients) related to payments that a third-party film production finance company ("Production Company A") made to Conover. Hudson and Conover then later materially misled their clients and Fund investors regarding the nature of these payments and the associated conflicts of interest they posed. Hudson and Conover also breached their fiduciary duties to their clients who invested in the Fund by preferencing one Fund investor's redemption request over the redemption requests of clients invested in the Fund.

2.      Between September 2017 and October 2021 ("Relevant Period"), Hudson and Conover advised both the Fund and the SMAs concerning investments in certain films produced by Production Company A. At the same time, Conover, through his affiliated company, Hudson Private Corp. ("Hudson Private"), received approximately $530,000 in executive producer compensation during the Relevant Period from Production Company A for the same films in which the Fund and the SMAs made investments. Hudson and Conover initially failed to disclose these payments and then later misrepresented to these clients that Conover earned this compensation for work as an executive producer on these films. In fact, Conover received these payments from Production Company A solely as a fee in exchange for the monies that the Fund and the SMAs invested in the films. Hudson and Conover also made materially false and misleading statements to investors in the Fund in its Form ADV Part 2B Brochure ("ADV Brochure") and in the Fund's private placement memorandum ("PPM") concerning these payments and the conflict they created.

3.      Furthermore, in May 2021, Hudson and Conover granted a redemption request from one Fund investor by paying that investor's redemption request in full, at the Fund's then-current valuation, while leaving several other simultaneously submitted redemption requests from Fund investors (who were also Hudson clients) outstanding and unpaid. In effecting this preferential redemption, Hudson and Conover violated their fiduciary duties to their clients who invested in the Fund.

### Respondents

4.      **Hudson** is a New York corporation with its principal place of business in Pearl River, New York. Hudson has been registered with the Commission as an investment adviser

---

[1]      The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

since March 2012. Hudson is the general partner of the Fund. In its Form ADV dated as of March 27, 2024, Hudson reported having 90 clients (including the Fund) with a combined total of approximately $112 million in regulatory assets under management.

5.  **Conover**, age 47, is a resident of Blauvelt, New York. Conover is the founder, sole owner, president, and chief executive officer of Hudson.

## Related Entities

6.  The **Fund** is a private investment fund founded by Conover, with Hudson as its general partner and investment manager. It relies on the exclusion from the definition of "investment company" found in Section 3(c)(1) of the Investment Company Act of 1940 and is a pooled investment vehicle. The Fund made investments in films by loaning capital to film production companies at specified monthly interest rates for pre-determined periods of time. As of Hudson's March 27, 2024 Form ADV, the Fund had approximately $18.5 million in assets under management.

7.  **Hudson Private** is a New York corporation that Conover founded in 2014 and of which Conover is the sole shareholder. During the Relevant Period, Conover used Hudson Private to receive the compensation he represented he earned as an executive producer for the films in which the Fund and the SMAs were invested.

## Background

8.  Conover founded Hudson in 2008 to provide wealth management services to high-net worth individuals. Since its founding, Conover has served as the CEO and president of Hudson and has been its sole shareholder. Hudson has been registered with the SEC as an investment adviser since March 2012.

9.  Beginning in 2014, Conover began raising money from Hudson's clients to invest in the Fund, which had as its primary objective investment in film and television projects.

10.  At all times, the Fund's portfolio of investments has consisted exclusively of interest-bearing loans that the Fund extended to finance films. Until 2017, the Fund invested in films produced by several different film production companies.

11.  In September 2017, Conover negotiated an agreement with a film production studio ("Film Studio A") and Production Company A, under which Hudson and Conover agreed that they would invest their clients' assets—both those of the Fund and the SMAs—exclusively in film projects offered by Film Studio A and financed by Production Company A. Thereafter Hudson and Conover caused all film loans made by the Fund and the SMAs to be made only to either Production Company A directly or to a joint venture between Film Studio A and Production Company A (the "Joint Venture").

3

## The Fund's and the SMAs' Film Investments

12.    From September 2017 forward, the Fund made film investments by loaning a specified amount of money to Production Company A, which Production Company A would then provide to Film Studio A for production of the specified film.

13.    In return, Production Company A agreed to pay the Fund a fixed interest rate that, together with the loan's principal, was amortized over the term of the loan. The interest rates for these loans ranged from approximately 10% to 30%, while the terms of these loans were between one and two years. At the expiration of the loan's term, any outstanding, unpaid amounts would accrue penalty interest at a higher rate, which was also pre-determined at the time of the investment.

14.    Limited partners of the Fund earned returns from the interest (and penalty interest) payments on the loans by Production Company A.

15.    Hudson and Conover also recommended that the SMAs make film investments directly through bilateral contracts between the client and either Production Company A or the Joint Venture. The SMAs then earned returns on their investments in the same way as the Fund.

## Conover's Receipt of Executive Producer Compensation

16.    During the Relevant Period, Film Studio A offered a percentage of the total films' budget as compensation to select executive producers. The total amount available as executive producer compensation for each film was fixed at the time the budget was determined. Each executive producer then earned their portion of the budgeted executive producer compensation based on the amount that they raised for the film.

17.    As part of Conover's agreement with Film Studio A and Production Company A to exclusively invest assets of the Fund and the SMAs in the film projects produced by Film Studio A and financed by Production Company A, Conover also negotiated the right to receive a share of the executive producer compensation for certain of the films in which these clients invested. Under this arrangement, Conover typically received 3% of the amount of total financing he was able to deliver through loans by either the Fund or the SMAs for a particular film, provided that the loans reached a specified, minimum dollar threshold.

18.    During the Relevant Period, Hudson and Conover advised the Fund and recommended the SMAs make loans to Production Company A and the Joint Venture totaling approximately $22 million to invest in eight different films. As a result of these investments, Conover received $531,787 in executive producer compensation from Production Company A

for these same films during the Relevant Period. Conover received these fees through payments to Hudson Private.

19.     Conover did not distribute any of this compensation to the Fund, its limited partners, or the SMAs whose investments had enabled Conover to obtain this compensation.

### Hudson and Conover Failed to Disclose the Material Conflict of Interest Resulting from Conover's Receipt of Executive Producer Compensation

20.     Between March 2017 and May 2019, neither the Fund's offering documents, including both the PPMs and the limited partnership agreement ("LPA"), nor Hudson's ADV Brochure, contained any disclosure related to Conover's actual or potential receipt of executive producer compensation by virtue of the film investments made by the Fund or the SMAs. Nor did these documents identify any actual or potential conflict of interest resulting from Conover's receipt of executive producer compensation more generally.

21.     Although Hudson updated its ADV Brochure in May 2019—and the Fund amended its PPM in June 2020—to include disclosures of Conover's receipt of fees related to his role as an executive producer, these disclosures were materially misleading because they either stated or implied that the executive producer fees paid to Conover were unrelated to his clients' investments.

22.     Specifically, Hudson's May 2019 ADV Brochure stated only that "Hudson Private [ ] receives fees related to Mr. Conover's role as an Executive Producer for film and television productions" and therefore "a conflict of interest exists to the extent Hudson has an incentive to recommend investments in films and television productions for which Mr. Conover serves as Executive Producer."  The revised ADV Brochure, and subsequent ADV Brochures during the Relevant Period, further stated (misleadingly), that "fees related to Mr. Conover's role as an Executive Producer are determined in advance of any client investment in a given film or television production and are not otherwise based on client investments."

23.     Similarly, the Fund's updated June 2020 PPM stated, in relevant part, that Hudson Private "receives compensation in the form of fees and Net Profit Participations related to Mr. Conover's role as an executive producer for film and television productions," and that "a conflict of interest exists to the extent [Hudson] has an incentive to recommend investments in films and television for the Fund for productions for which [Conover] serves as Executive Producer or otherwise receives production fees." The revised PPM also stated that "a conflict of interest exists to the extent the General Partner has an incentive to recommend to the Fund investments in films and television productions for which Mr. Conover serves as Executive Producer."

24.     These representations were materially false and misleading because they (a) failed to disclose that Conover's executive producer compensation was based *solely* on the amounts of money loaned by the Fund and the SMAs to Production Company A for these films and not for

any non-investment related production work; and (b) falsely stated that this compensation was "not . . . based on client investments."

25.     In early 2021, Production Company A began defaulting on the remaining loans made by both the Fund and the SMAs. As a result, in or around that same time, the Fund and the SMAs ceased making any new investments with Production Company A. In September 2021, Hudson announced that it was suspending all investor withdrawals from the Fund and would no longer market the Fund or raise new investor capital for the Fund.

26.     Thereafter, in October 2021, the Fund filed a lawsuit against Production Company A, the Joint Venture, and Film Studio A seeking repayment of the amounts outstanding on these loans, including principal, interest, and penalty interest. *See Hudson Private LP v. Bron Studios USA, Inc., et al.*, 21 Civ. 8259 (S.D.N.Y.).

**<u>Hudson and Conover Improperly Preferenced the Redemption of a Limited Partner</u>**

27.     According to the LPA, limited partners who wanted to redeem their investments in the Fund were required to give at least 90 days' notice for the redemption and were capped at a withdrawal of 50% of their Fund investment on a quarterly basis.

28.     During the Relevant Period, Production Company A was routinely delinquent in its monthly payments on the film loans the Fund provided. As a result, the Fund frequently lacked sufficient liquidity to satisfy outstanding redemption requests in full.

29.     Generally, when the Fund could not satisfy all pending redemption requests, Hudson and Conover would cause the Fund to partially satisfy redemption requests by distributing its available cash on a *pro rata* basis to the redeeming investors.

30.     In May 2021, however, Hudson and Conover deviated from their practice of satisfying limited partner redemptions in the Fund on a *pro rata* basis when it lacked the liquidity to satisfy such requests in full. Instead, at Conover's direction, the Fund redeemed a single investor ("Investor A") in full ahead of other simultaneously submitted redemption requests from other Fund investors, who were pre-existing Hudson clients.

31.     Specifically, Conover preferenced Investor A's redemption request of $187,789 ahead of approximately $750,000 of other redemption requests that were submitted simultaneously by Fund investors who were Hudson's and Conover's advisory clients.  These other redemption requests were left entirely unfulfilled.

32.     Conover preferenced Investor A's redemption request over the duly-noticed redemption requests of these other investors because Investor A was a portfolio manager at a large private equity firm who, Conover believed, might dissuade others in the industry from investing with Hudson and/or initiate litigation against Hudson if Investor A's redemption request was not timely honored in full.

33.     Neither Hudson nor Conover disclosed to, or otherwise obtained consent from, the limited partners in the Fund for this grant of preferential treatment. Investors whose redemption requests were not prioritized were left to bear the market risk of the Fund's remaining assets, and certain of these investors were unable to exit the Fund following its suspension of all withdrawals from limited partner capital accounts in September 2021.

## **Violations**

34.     As a result of the conduct described above, Hudson and Conover willfully[2] violated Section 206(2) of the Advisers Act, which prohibits an investment adviser from engaging in any transaction, practice or course of business that operates as a fraud or deceit upon a client or prospective client. Scienter is not required to establish a violation of Section 206(2), which may rest on a finding of simple negligence. *SEC v. Steadman*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194-95 (1963)).

35.     As a result of the conduct described above, Hudson and Conover also willfully violated Section 206(4) of the Advisers Act, and Rule 206(4)-8 thereunder, which make it unlawful for an investment adviser to a pooled investment vehicle to "[m]ake any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle," or "engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle." Scienter is not required to establish a violation of Section 206(4) or the rules thereunder. *Steadman,* 967 F.2d at 647.

## **Disgorgement and Civil Penalties**

36.     The disgorgement and prejudgment interest ordered in paragraph IV.D. is consistent with equitable principles and does not exceed Respondent Conover's net profits from his violations and will be distributed to harmed investors, if feasible. The Commission will hold funds paid pursuant to paragraph IV.D. in an account at the United States Treasury pending a decision whether the Commission in its discretion will seek to distribute funds. If a distribution is determined feasible and the Commission makes a distribution, upon approval of the distribution final accounting by the Commission, any amounts remaining that are infeasible to return to investors, and any amounts returned to the Commission in the future that are infeasible to return

---

[2]     "Willfully," for purposes of imposing relief under Sections 203(e) and (f) of the Advisers Act, "'means no more than that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "also be aware that he is violating one of the Rules or Acts." *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965). The decision in *The Robare Group, Ltd. v. SEC*, which construed the term "willfully" for purposes of a differently structured statutory provision, does not alter that standard. 922 F.3d 468, 478-79 (D.C. Cir. 2019) (setting forth the showing required to establish that a person has "willfully omit[ted]" material information from a required disclosure in violation of Section 207 of the Advisers Act).

to investors, may be transferred to the general fund of the U.S. Treasury, subject to Section 21F(g)(3) of the Exchange Act.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Sections 203(e), 203(f) and 203(k) of the Advisers Act, it is hereby ORDERED that:

A.    Respondents Hudson and Conover cease and desist from committing or causing any violations and any future violations of Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)-8 promulgated thereunder.

B.    Respondents Hudson and Conover are censured.

C.    Respondent Hudson shall pay a civil money penalty in the amount of $200,000 to the Securities and Exchange Commission. The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury.

Payments shall be made in the following installments:

- $50,000 within 14 days of the entry of this Order;
- $50,000 within 120 days of the entry of this Order;
- $50,000 within 240 days of the entry of this Order; and
- $50,000 within 360 days of the entry of this Order.

Payments shall be applied first to post-order interest, which accrues pursuant to 31 U.S.C. § 3717. Prior to making the final payment set forth herein, Respondent Hudson shall contact the staff of the Commission for the amount due. If Respondent Hudson fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission.

D.    Respondent Conover shall pay disgorgement of $531,787, prejudgment interest of $95,924.09, and a civil penalty of $150,000, totaling $777,711.09 to the Securities and Exchange Commission. The Commission will hold disgorgement and prejudgment interest paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the

8

Commission, in its discretion, will seek to distribute funds or, transfer them to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600. The Commission may also distribute civil money penalties collected in this proceeding, if in its discretion, the Commission orders the establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) off the Sarbanes-Oxley Act of 2002. The Commission will hold civil penalties paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds, or subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

Payments shall be made in the following installments:

- $194,427.77 within 14 days of the entry of this Order;
- $194,427.77 within 120 days of the entry of this Order;
- $194,427.77 within 240 days of the entry of this Order; and
- $194,427.78 within 360 days of the entry of this Order.

Payments shall be applied first to post-order interest, which accrues pursuant to 31 U.S.C. § 3717 and Commission Rule 600. Prior to making the final payment set forth herein, Respondent Conover shall contact the staff of the Commission for the amount due. If Respondent Conover fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission.

Payment must be made in one of the following ways:

(1)     Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Hudson Valley Wealth Management, Inc. and/or Christopher Conover, as appropriate, as Respondents in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Lee A. Greenwood, Assistant Regional Director, Asset Management Unit, Division of Enforcement, Securities and Exchange Commission, 100 Pearl Street, Suite 20-100, New York, NY 10004.

E.       Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agrees that in any Related Investor Action, Respondents shall not argue that Respondents are entitled to, nor shall Respondents benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agrees that Respondents shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, the findings in this Order are true and admitted by Respondent Conover, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent Conover under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent Conover of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

By the Commission.

Vanessa A. Countryman
 Secretary

10