dotloop signature verification: dtlp.us/mbIy-QRao-jFFh

# CREATIVE WEALTH MEDIA FINANCE CORP.
## PARTICIPATION AGREEMENT

**AGREEMENT** made this __3rd__ day of _February, 2022_ (the "**Effective Date**") by and between **CREATIVE WEALTH MEDIA FINANCE CORP.**, a Canadian corporation, provincially registered in the Province of Ontario with its office at 151 Bloor Street West, Suite 700, Toronto, Ontario M5S 1S4 (hereinafter referred to as the "**Lender**") and _____Casey Oaks_____ (hereinafter referred to as the "**Participant**").

**WHEREAS:**

A.  Lender has entered into a term sheet agreement attached hereto as Schedule "A" (the "**Term Sheet**") with National Anthem Holdings LLC and National Anthem ProdCo (hereinafter collectively referred to as the "**Borrower**" in respect to Motion Picture production entitled "National Anthem" (hereinafter, such initial production is collectively referred to as **Picture 1**"), a true copy of said Term Sheet having been delivered to Participant, and Participant having independently reviewed and approved same;

B.  Pursuant to the terms of the Term Sheet, (together with any amendments, supplements, extensions and renewals thereof, and any related agreements, security agreements, documents and instruments, hereinafter collectively referred to as the "**Financing Agreements**"), Lender has entered and/or will enter into certain financing arrangements and has extended and/or will extend from time to time loans, advances, equity investments and other financial accommodations to the Borrower (the "**Advances**"), upon certain collateral security including the present and future accounts of the Borrower (the "**Collateral**"); and

C.  Participant wishes to acquire from the Lender, upon the terms and conditions hereinafter set forth, an undivided fractional interest in all present and future Advances by Lender, and to the extent necessary to repay the Participation (as hereinafter defined), an undivided fractional interest in the Collateral.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and promises herein contained, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties), the parties hereto agree as follows:

1.  (a)  Lender hereby sells to the Participant and the Participant hereby agrees to purchase from the Lender an undivided fractional interest in all present and future Advances made by Lender (the "**Participation**"). The Participation shall be to the extent of USD$[250,000] (2.457%) (the "**Participation Percentage**") of the Advances (hereinafter referred to as the "**Participation Advance**"). The Participation Advance will be paid by Participant to the Lender in accordance with the payment instructions attached hereto at Schedule "B".

    (b)  The relationship between Lender and Participant is and shall be that of a seller and purchaser of an undivided fractional interest (i.e., an outright sale and assignment by Lender to Participant of an interest in all present and future Advances by Lender, together with the Collateral therefor), not a debtor-creditor relationship. Accordingly, Lender has not guaranteed repayment to Participant of, nor agreed to repurchase from Participant, any portion of the Participation at any time.

2.  Participant agrees that Lender will retain in Lender's name, but to the extent of the Participation, on behalf of Participant, all of the obligations of the Borrower to Lender arising out of the Financing Agreements, and Lender will, in its name, collect and receive payments with respect to all present and future Advances by Lender and of any amounts paid or recovered from (a) the Borrower pursuant to the Financing Agreements, (b) any guarantor or other entity liable in respect of the obligations of the

dotloop signature verification: dtlp.us/mbIy-QRao-jFFh

- 2 -

Borrower under the Financing Agreements, or otherwise, and (c) the recovery or realization on any Collateral or other property, rights and claims in favour of Lender or which may be received by or may come into the possession of Lender; provided that any such amounts are applicable to the payment or discharge of any of the obligations of the Borrower pursuant to the Financing Agreements or otherwise (all of the foregoing being hereinafter called "**Collections**").

3.  (a)  Participant shall participate in the Collections and be repaid principal and interest and share in "Defined Gross Receipts" (as defined in the Term Sheet) derived from exploitation of Production 1 to the extent of its Participation.

    (b)  To the extent of the Participation, Lender is and shall be a trustee for Participant in administering and servicing the Financing Agreements and all rights, remedies and benefits thereunder, including making all present and future Advances, the perfection of security interests and other liens in the Collateral, receiving Collections, execution of agreements in connection therewith and the exercise of all other rights and remedies of a lender and secured party with respect thereto.

    (c)  Lender shall have the obligation to account to Participant for Participant's share of the Collections. All Collections and/or payments received by Lender with respect to Participant's interest in all present and future Advances by Lender, including proceeds of Collateral and claims with respect thereto, which are received by Lender shall be held in trust for Participant and deposited by Lender in one or more of its bank accounts and applied as provided herein.

4.  (a)  Lender's books and records showing the account between Lender and the Borrower and statements of account rendered to Participant shall be considered accurate unless objected to by Participant within sixty (60) days from their date

    (b)  Lender agrees to pay and otherwise account to Participant on or about fifteen (15) calendar days after Lender's actual receipt of amounts due and payable to Lender pursuant to the Financing Agreements, amounts due and payable to Participant after deducting the Commission, as such amounts are earned and paid by the Borrower to Lender, pursuant to the terms of the Financing Agreements.

5.  Participant represents and warrants as follows to the Lender at the date of this Agreement and at the date the Participant provides the amount of the Participation Advance to Lender by way of certified cheque, bank draft or wire transfer or such other method of payment acceptable to Lender, or such other date and time as may be determined by Lender (hereinafter referred to as the "**Closing Date**") and acknowledges and confirms that the Lender is relying on such representations and warranties in connection with this Agreement:

    (a)  Participant represents and warrants that it is a non-resident of Canada within the meaning of the *Income Tax Act* (Canada) and that it is entitled to receive all payments hereunder without Lender being required to deduct or withhold any amount therefrom on account of duties, taxes, levies, imports, fees, interest or penalties (each a "**Tax**" and collectively "**Taxes**"). If any deduction or withholding for Taxes is required by law or the administrative practice of any taxation authority, Canadian or otherwise, Lender shall be entitled to make such deduction or withholding from any payment hereunder and to pay the full amount so deducted or withheld to the relevant taxation authority in accordance with applicable law. Participant shall notify Lender immediately if any Taxes are required to be deducted or withheld upon any payment to Participant hereunder and shall provide any certificates, Tax forms or other information reasonably requested by Lender in connection with the reporting or payment of any Taxes relating to this Agreement. Participant shall indemnify Lender on demand on an after-Tax basis for all losses, claims, liabilities, Taxes or expenses incurred by Lender as result

of (i) any failure by the Participant to comply with any Tax reporting or payment requirements relating to this Agreement; (ii) any inaccuracy of the foregoing representation and warranty and (iii) any payment by Lender to Participant hereunder with the required deduction or withholding for Taxes.

(b)    The Participation has not been made through, or as a result of, and is not being accompanied by, (i) a general solicitation, (ii) any advertisement including articles, notices or other communications published in any newspaper, magazine or similar media or broadcast over radio or television, or (iii) any seminar or meeting whose attendees have been invited by general solicitation or general advertising.

(c)    None of the amounts that the Participant is committing to pay to the Lender are to the knowledge of the Participant, proceeds obtained or derived, directly or indirectly, as a result of illegal activities.

(d)    If the Participant is an individual, he or she is of legal age and is legally competent to execute, deliver and perform his or her obligations under this Agreement. If the Participant is not an individual, (i) it has the legal capacity and competence to execute, deliver and perform its obligations under this Agreement; and (ii) the execution and delivery of and performance by the Participant of this Agreement have been authorized by all necessary corporate or other action on the part of the Participant;

(e)    If the Participant is committing on its own behalf, this Agreement has been duly executed and delivered by the Participant, and constitutes a legal, valid and binding agreement of the Participant enforceable against him, her or it in accordance with its terms;

(f)    The execution and delivery of and performance by the Participant of this Agreement does not and will not (or would not with the giving of notice, the lapse of time or the happening of any other event of condition) result in a breach or violation of or a conflict with, or allow any other person to exercise any rights under any of the terms or provisions of the Participant's constating documents or by-laws, if applicable, or any other contract, agreement, instrument, undertaking or covenant to which the Participant is a party or by which it is bound; and

(g)    Participant is an "Accredited Investor" as defined in Securities and Exchange Commission (SEC) Regulation D- Rule 501.

6.    Except as otherwise provided in this Section 6, Lender agrees it shall not amend, alter, modify, waive or release in any material respect, the provisions of the Term sheet related to the Interest, Maturity Date, and Lender's right to recoup the Repayment Amount without prior written consent of Participant in each instance. In the event there are other participants with Lender in respect of the arrangements between Lender and Borrower pursuant to the Financing Agreements, Lender and Participant hereby agree that, notwithstanding the immediately preceding sentence, Lender may take any of the material actions referred to in such preceding sentence, and Participant shall be bound thereby, with the consent of such Participants (including Lender as a Participant for this purpose) whose interest in the Participation Advances equal or exceed sixty-six and two-thirds percent (66 2/3%) of the total outstanding Participation Advances. Furthermore, Participant confirms and acknowledges that the Lender is relying on such agreement in connection with the execution of this Agreement.

(a)    If the Participant notifies the Lender that it will not give its consent to any of the proposed amendments to be taken by the Lender that are described in this Section 6, the Lender shall have the option (exercisable upon the Lender providing the Participant with written notice within ten (10) Business Days (as defined below) of the Participant's non-consenting notice)

dotloop signature verification: dtlp.us/mbly-QRao-jFFh

- 4 -

an amount equal to ten percent (10%) compounded annually or the maximum interest rate allowable by law if said rate equals or exceeds the lawful maximum interest Rate to: (i) purchase, or cause to be purchased, the Participant's Participation hereunder within twenty (20) Business Days after the Lender notifies the Participant in writing of its intention to exercise such purchase option; (ii) terminate, upon written notice to the Participant, the Participation; and (iii) sell or grant any such Participation, or both, to another person. For greater certainty, "**Business Day**" means any day that is not a Saturday, Sunday, or a day on which banks in the state of New York or Canada are required or permitted to be closed.

(b)     Any purchase or termination under Section 6(a) shall occur on a date selected by the Lender as specified in its notice as required thereby. Any such purchase shall be at a price equal to the Participation Advance for such Participation, plus accrued Interest (*i.e.,* an amount equal to ten percent (10%) compounded annually or the maximum interest rate allowable by law if said rate equals or exceeds the lawful maximum interest rate) as of the date of purchase, plus the Participant's Participation Percentage of any other monies paid by the Borrower to the Lender under the Financing Agreements and not yet distributed under the terms of this Agreement, through the date of such purchase. The applicable purchase price shall be paid on such date in immediately available funds and, concurrently therewith, the Participant shall execute and deliver to the Lender documents assigning its Participation to the Lender or to such other person as the Lender may direct.

7.     Participant shall pay all stamp duty, documentation, registration, transfer or other like Taxes, if any, which may now or hereafter be imposed in connection with this Agreement or the purchase of the Participation and shall indemnify Lender on demand on an after-Tax basis against any liability resulting from any delay or failure by Participant to pay such Taxes. Participant's obligations under this Section shall survive the termination of this Agreement.

8.     Participant hereby agrees that Lender shall have the right to carry out the provisions of the Financing Agreements with the Borrower, and to exercise all rights and privileges accruing to it by reason of the provisions thereof, and to enforce its rights thereunder for the joint benefit of Lender and Participant, according to its discretion and the exercise of its business judgment, in accordance with its normal operating procedures.

(a)     Participant further acknowledges the risks inherent in making loans and/or equity investments in Production 1 and the related risks inherent in developing, producing, and marketing Production 1, including but not limited to the possibility of cost overruns, lower sales than anticipated and loss of financing. Lender makes no representation or warranty as to the commercial release of Production 1 or the amount of proceeds, if any, to be received from exploitation of Production 1. There is no assurance that Participant will earn a profit from or recoup its Participation. Lender agrees that it will use normal prudence and judgment in the servicing of the account and in the carrying out of the terms of the Financing Agreements. Lender shall not have any liability to Participant with respect to any action taken or omitted by Lender, its employees or agents, in connection with the Financing Agreements or for any error in judgment except for its own gross negligence or wilful misconduct. Lender does not assume, and shall not have, any responsibility or liability, express or implied, for the enforceability or collectability of the Financing Agreements, the Collateral or the condition of the Borrower or guarantors or any obligor, financial or otherwise, or the Collateral, or for the accuracy of any credit or other information furnished by the Borrower unless Lender has acted with gross negligence or wilful misconduct. Participant acknowledges that it may make its own independent investigation of the Borrower and that it will be given access to all information with respect to the Borrower and Lender that it wished to have and an opportunity to make such inquiry of the Borrower as to Borrower's condition and the arrangements between the Borrower and Lender and inquiry of Lender in connection therewith as Participant determines

dotloop signature verification: dtlp.us/mbIy-QRao-jFFh

- 5 -

to be necessary or appropriate. Participant has obtained such legal and tax advice as it considers appropriate in connection with the Participation and the execution, delivery and performance by it of this Agreement and the transactions contemplated by this Agreement. The Participant is not relying on the Lender, its affiliates or counsel to any of them in this regard.

(b)     The Participant acknowledges that: (A) THE PARTICIPATION ADVANCE PROVIDED TO THE LENDER PURSUANT TO THE TERMS AND CONDITIONS HEREOF IS NOT WITHOUT RISK AND THE FINANCIER MAY LOSE FINANCIER'S ENTIRE PARTICIPATION ADVANCE; (B) Lender may complete additional financings or borrowings in the future in order to develop the business of the Lender and fund its ongoing development, and such future financings may affect the Participant's rights hereunder but there is no assurance that such financing will be available, on reasonable terms or at all, and if not available, the Lender may be unable to fund its ongoing development; and (C) the Lender has the right to accept or reject the Participation Advance in whole or in part. If the Participation Advance is rejected in whole or in part, all or a portion of the Participation Advance, as the case may be, will be promptly delivered to the Participant, without interest.

9.     Lender agrees that at any time and from time to time during normal business hours, it will permit Participant or its agent to examine Lender's books, records and accounts relating to the Collateral and the Financing Agreements and it will upon request furnish Participant with such information requested as it may have or be reasonably able to obtain with respect to the Collateral or any other matter connected with the Financing Agreements and with copies of all papers and documents relating to the Collateral and the transactions in them and with financial statements and audit reports showing the status of the Collateral. Participant agrees that it will keep all such information confidential.

10.     Lender shall not, without the prior written consent of Participant, offset any claim or demand in favour of Lender or of any other client of Lender pertaining to indebtedness or obligations of Borrower wherein Participant does not participate, against or to the detriment of Participant, Participant shall not, without the prior written consent of Lender, offset any claim or demand in favour of Participant against or to the detriment of Lender or to the detriment of any credit balances for or to the account of the Borrower. In the event of any claim or action arising out of this Agreement, both Lender and Participant agree not to deduct, counterclaim or set-off any amounts which may be owed on account of other dealings between them; and, similarly, no amounts owing under this Agreement shall be deducted counterclaimed or set-off on account of other dealings between Lender and Participant.

11.     This Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of the parties hereto and shall be governed and interpreted in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

12.     Participant shall not sell, pledge, assign, sub-participate or otherwise transfer its rights under this Participation Agreement, the Collateral, or the Collections, without the prior written consent of Lender.

13.     Nothing contained herein shall confer upon Lender or Participant any interest in, or subject either of them to any liability for, or in respect of the business, assets, profits, losses or liabilities of the other, except only as to the Participation.

14.     All notices, requests and demands to or upon the respective parties hereto shall be deemed to have been duly given or made: if by hand, immediately upon sending; if by overnight delivery service, one(1) day after dispatch; and if mailed by registered mail, return receipt requested, five (5) days after mailing. All notices, requests and demands are to be given or made to the respective parties at the address set forth herein; if to Lender, to the attention of:

dotloop signature verification: dtlp.us/mbly-QRao-jFFh

Creative Wealth Media Finance Corp.
151 Bloor St West Suite 700, Toronto, Ontario M5S 1S4
<u>Attention</u>: Jason Cloth

if to Participant, to the attention of
234 Seville Dr., Murrells Inlet, SC, 29576
<u>Attention: Casey Oaks</u>

15.    Each of the parties hereto confirms that it has no loans or financing transactions with the Borrower, or any guarantor except those transactions which are the subject of this Agreement or have been disclosed in writing to the other party and each agrees not to enter into any financing arrangement with any of them without notifying the other party hereto. Participant shall not, and will cause its subsidiaries and affiliates not to contact, directly or indirectly, any Borrower or any guarantor, for the purpose of soliciting or taking away the financial or other services furnished by Lender to the Borrower.

16.    In the event Lender should at any time terminate the Financing Agreements for any reason it shall promptly notify Participant thereof and this Agreement shall automatically terminate effective upon the effective date of the termination of the Financing Agreements. In addition, Lender shall have the right to purchase the Participation for the full amount thereof, together with accrued interest and concurrently therewith terminate this Agreement effective at the end of the initial term of the Financing Agreements upon at least thirty (30) days prior written notice. Termination of the Participation Agreement shall not affect the respective rights or obligations hereunder incurred prior to the effective date of such termination including obligations to participate in post-termination Advances in the event of liquidation.

17.    This Agreement will be governed by, interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein. Participant irrevocably attorns and submits to the non-exclusive jurisdiction of the courts of the Province of Ontario with respect to any matters arising out of this Agreement and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

18.    Participant will execute, deliver, file and otherwise assist the Lender in filing any reports, undertakings and other documents required in connection with this Agreement.

19.    The following Schedules are incorporated into and form an integral part of this Agreement, and any reference to this Agreement includes the Schedules:

**SCHEDULE "A"& "B"**

Term Sheet Schedule "A"
Payment Information Schedule "B"

**Assignment**

This Agreement becomes effective when executed by all of the parties to it. After that time, it will be binding upon and enure to the benefit of the parties and their respective successors, heirs, executors, administrators and legal representatives. This Agreement is only transferable and/or assignable by the Lender.

dotloop signature verification: dtlp.us/mbIy-QRao-jFFh

- 7 -

**Entire Agreement**

This Agreement including the schedules constitutes the entire agreement between the parties with respect to the transactions contemplated by it and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. There are no representations, warranties, covenants, conditions or other agreements, express or implied, collateral, statutory or otherwise, between the parties in connection with the subject matter of this Agreement, except as specifically set forth in this Agreement. The parties have not relied and are not relying on any other information, discussion or understanding in entering into and completing the transactions contemplated by this Agreement.

**Time of Essence**

Time is of the essence in this Agreement.

**Language of Documents**

It is the express wish of the parties to this Agreement that this Agreement and all related documents be drafted in English. Les parties aux présentes conviennent et exigent que cette convention ainsi que tous les documents s'y rattachant soient rédigés en langue Anglais.

**Execution by Facsimile and Counterparts**

This Agreement including the schedules may be executed in any number of counterparts (including counterparts by facsimile or electronic transmission or portable document format ["PDF"]) each of which including facsimile or electronic transmissions or PDFs when so executed and delivered shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument.

- 8 -

The parties have executed this Agreement on the dates set forth below to be effective as of the Effective Date.

**CREATIVE WEALTH MEDIA FINANCE CORP.**

Per: _____

Name:  Jason Cloth
Title:     Authorized Signing Officer

Date:

**PARTICIPANT**

Per:

Name: Casey Oaks

dotloop verified
02/04/22 10:03 AM EST
ZL03-P2YX-AOQR-R4LR

Date:

dotloop signature verification: dtlp.us/mbly-QRao-jFFh

**SCHEDULE "A"**

**TERM SHEET**

[see attached]

dotloop signature verification: dtlp.us/mbly-QRao-jFFh

**SCHEDULE "B"**

**PAYMENT INFORMATION**

The Participation Advance may be included with the executed Participation Agreement by certified cheque or bank draft payable to CREATIVE WEALTH MEDIA FINANCE CORP., 151 Bloor Street West, Suite 700, Toronto, Ontario M5S 1S4 or wired in immediately available funds to Creative Wealth Media Finance Corp. as follows:

████████

| ████ | ███████ |
|---|---|
| ████ | ████████████ |
| ██████ | ███ ████████ |
| ████ | ██████████ |
| █████████ | ███████████ |
| █████████ | ████ |
| ██████ | █████████████ ███████ |

- 2 -

PAGE LEFT BLANK

dotloop signature verification: dtlp.us/SKZf-fs0b-NwEF

**TERM SHEET**
**FINANCING FOR THE MOTION PICTURE TENTATIVELY ENTITLED**
**"NATIONAL ANTHEM" (the "Project")**

| | |
|---|---|
| **Media Fund:** | Creative Wealth Media Finance Corp. (the "Media Fund"), wishes to obtain financing from Investor in connection with the production of the Project. |
| **Underlying Beneficiary:** | National Anthem Holdings, LLC ("**HoldCo**") and National Anthem ProdCo Inc. ("**ProdCo**" where HoldCo and ProdCo collectively are "**Underlying Beneficiary**") |
| **Investment:** | Investor shall provide Creative Wealth Media Finance Corp. (the "**Media Fund**") with an amount of $250,000(the "**Investment**") representing 2.457% of the overall $10,172,500 USD, which Investment shall be subject to the same terms as the Loan as set forth hereunder. |
| **Investor:** | _____Casey Oaks_____(the "**Investor**"). |
| **Copyright Owner:** | The ownership of the copyright in the Project and all subsidiary and derivative production rights therein ("**Project Rights**") shall be owned by Holdco. |
| **Completion Arrangements:** | Bron Studios USA Inc. (the "Guarantor") hereby guarantees to Media Fund the completion and delivery of the Project to any and all distributors with distribution agreements (the "Guaranteed Obligations") until such time as Lender and Film Finances Canada Ltd. (the "Completion Guarantor") will enter into an industry standard Completion Guaranty in a form approved by Lender in writing. |
| **Loan:** | Subject to satisfaction of certain conditions precedent, as more fully set forth in a loan and security agreement to be entered into between the Underlying Beneficiary and Media Fund  (the "LSA"), Media Fund will advance a payment to Underlying Beneficiary in the amount of up to USD $10,172,500 (inclusive of the Facilitation Fee and Legal Fee) (the "Loan"). |
| **Interest Rate:** | The Loan will bear interest at a rate of 12% compounded annually (the "Interest"). |
| **Maturity Date:** | The maturity date of the Loan shall be 24 months from the date of Initial Disbursement (as defined below). |
| **Loan Facilitation Fee:** | Media Fund  will charge to Underlying Beneficiary and Underlying Beneficiary shall pay, upon the Initial Disbursement (as defined below), a loan facilitation fee equal to three percent (3%) of the Net Commitment Amount (the "Loan Facilitation Fee") and the Legal Fee (defined below). The Loan Facilitation Fee, calculated on the Net Commitment Amount, shall be earned and paid by the Underlying Beneficiary upon each Disbursement under the Loan. The Loan |

| | |
|---|---|
| | Facilitation Fee shall be paid to Media Fund by deducting the Loan Facilitation Fee from each Disbursement payable to Underlying Beneficiary hereunder. The Underlying Beneficiary shall also pay the legal fees and expenses of the Media Fund in the amount of US$25,000.00 (the "**Legal Fee**") which amount is in addition to the Loan Facilitation Fee and payable as part of the initial Disbursement.<br><br>For purposes hereof, "**Disbursement**" means the each disbursement of funds comprising the Loan, in whole or in part, paid by the Media Fund to the Underlying Beneficiary. |
| **Net Profit Participation:** | In consideration for funding the full Net Commitment Amount, Underlying Beneficiary shall pay Media Fund an amount equal to 40% of the Net Profits, with "**Net Profits**" to be defined and calculated in accordance with the "Distribution of Collected Gross Receipts". Of Media Fund 40% Net Profit entitlement, Media Fund shall retain 5%, Investors shall be allocated their proportionate participation in remaining 35% of Media Fund Net Profit. |
| **Source of Repayment:** | Subject to any intercreditor agreement between Media Fund and other financiers of the Project (including Tax Credit Financier – defined below) in a form to be pre-approved by Media Fund in writing, Media Fund shall have the right to recoup the Repayment Amount (defined below), in first position from all gross receipts, exclusive of all tax credit proceeds necessary to repay the Tax Credit Financier, if any, derived from exploitation of the Project Rights in all territories throughout the world, in accordance with "Waterfall" payment schedule attached hereto as Schedule A. "**Repayment Amount**" means all of Underlying Beneficiary monetary obligations to Media Fund hereunder and under the other documents, instruments and agreements to be executed by Underlying Beneficiary pursuant hereto (including, but not limited to, the LSA) including repayment of the Loan and the Interest in connection therewith, and all fees, costs and expenses Underlying Beneficiary is obligated to pay Media Fund in connection therewith.  For clarity, the Repayment Amount shall not include Media Fund share of the Net Profits as will be defined in the LSA. |
| **Subsequent Seasons:** | Media Fund shall have the exclusive right, but not the obligation, to provide financing in respect of all episodes and subsequent seasons arising from the Project (collectively, "**Subsequent Productions**"), for the life of the Project, on substantially similar terms and conditions set forth herein, except that so long as Media Fund has advanced to Underlying Beneficiary 100% of the Net Commitment Amount. |
| **Budget:** | The current draft budget for the Project is **USD$10,500,000** (attached as Schedule B hereto) and it shall not exceed such amount without Media Fund prior written approval. The budget of the Project, once approved by the Media Fund Completion Guarantor and Underlying Beneficiary will be the "**Approved Studio Budget**". Lender shall not be responsible for any expenditures in excess of the Approved Studio Budget, if any. |

| | |
|---|---|
| **Tax Credit Financier:** | The financier of the tax incentives in respect of the Project will be determined at a later date (the "**Tax Credit Financier**"). |
| **Use of Investment:** | Proceeds of the Loan, less the Facilitation Fee and the Legal Fee, shall be used exclusively to finance the pre-production, production, post-production, and delivery of the Project, in accordance with the Approved Studio Budget. |
| **Distributor Pre-Sales:** | Underlying Beneficiary hereby confirms that there are currently no binding pre-sales concluded for the Project.. |
| **Project Specifications:** | The Project shall have the following specifications:<br><br>1. Be based on the screenplay dated June 8, 2021 by Tony Tost.<br>2. Production overseen by BRON Studios USA Inc.<br>3. Have an MPA rating no more restrictive than R.<br><br>Any changes to the above specifications shall require preapproval by Media Fund in writing. |
| **Security:** | The obligations of Underlying Beneficiary to Media Fund with respect to the Loan described herein shall be secured in first priority position, by all of Underlying Beneficiary assets, including, without limitation, Underlying Beneficiary right, title and interest in or relating to the Project, and all of Underlying Beneficiary (and any affiliates') right, title and interest in any of the revenue arising out of or relating to the Project, including, without limitation, the completion guaranty and insurance policy issued in connection with the Project and all excess tax and other incentives and so-called "soft monies" in connection with the Project (i.e. after repayment of the Tax Credit Lender), all as set forth in greater detail in the security documentation being entered into contemporaneously herewith, which security documentation will include a copyright mortgage and deed of charge (the "**Collateral**"). In addition to the related security documentation to be entered into contemporaneously herewith, Media Fund shall be entitled to file one or more financing statements in all applicable jurisdictions in order to perfect its security interest in the Collateral. |
| **Borrower Representations and Warranties:** | Underlying Beneficiary hereby represents and warrants to Media Fund as follows:<br><br>a. There is no action, suit or proceeding (actual or threatened) at law or in equity or by or before any governmental instrumentality or other agency concerning the Project, or any investigation of the affairs concerning the in any respect.<br>b. Underlying Beneficiary owns all right, title and interest necessary to produce, distribute, exhibit and otherwise exploit the Project throughout the universe. |

dotloop signature verification: dtlp.us/5KZf-fs0b-NwEF

|  | c. Bron Releasing and Endeavor Content are engaged as the sales agent for all worldwide distribution rights in respect of the Project; |
|  | d. No material or matter used in or in connection with the Project will infringe any copyrights, statutory or common law, or violate the rights of any third party. |
|  | e. The Project will be completed and delivered and will be technically acceptable to theatrical and/or premium SVOD exhibitors and broadcasters U.S. and elsewhere. |
|  | f. Underlying Beneficiary and BRON Studios are duly constituted, registered and organized company and is in good standing under the laws governing them, and they have the right and authority to enter into this Term Sheet and to grant the rights provided to Media Fund set forth herein. |
| **Conditions Precedent:** | The LSA shall outline a complete set of conditions precedent (the "**Conditions Precedent**"). All obligations of the Media Fund will be contingent on the satisfaction of the Conditions Precedent in Media Fund sole discretion. The Conditions Precedent shall include, but are not limited to: |
|  | a. Chain of Title. Chain of title, including proof of payment and a legal opinion, copyright registrations, in form and substance approved by Media Fund in its sole discretion, for the screenplay and the Project, which provides that, the copyright and distribution rights are held in the name of Underlying Beneficiary. |
|  | b. Financing/Security Documents. Financing Documents and such other security documents as may be reasonably required by Media Fund, being fully executed (and notarized, if applicable) and unconditionally delivered to Media Fund. |
|  | c. Corporate Documentation. The articles of association, resolutions and all other organizational documentation of Underlying Beneficiary and qualifications of Underlying Beneficiary qualified to do business under applicable law, including, without limitation, any foreign qualifications to do business as may be required and a corporate legal opinion in a form satisfactory to Media Fund. |
|  | d. Key Cast and Crew Agreements. All agreements for key cast, key crew (including director, director of photography, producers, composer and editor). |
|  | e. Errors & Omissions and Production Insurance Policies. Insurance policies with endorsements in favour of Media Fund as an additional insured. Underlying Beneficiary represents and confirms that that there are no "essential elements" or exclusions. |
|  | f. Proof of Financing. Financing agreements between Underlying Beneficiary and other financiers, in a form acceptable to Media |

|  | Fund evidencing that the Approved Studio Budget will be fully financed and advanced directly for production of the Project and spent in accordance with the Approved Studio Budget. |
|  | g. <u>Sales Documents.</u>  Sales Agent Agreements, including Sales Estimates whereby Lender has the right to terminate the Sales Agents in accordance with the terms of the agreement. |
|  | h. <u>Additional Documents.</u>  Any such additional documents, instruments or agreements that  may reasonably require for the purposes of the Loan, including, without limitation, the Budget and approved production schedule, approved cash flow schedule, screenplay approved by the Completion Guarantor, all the duly signed material contracts, and the "Closing Documents" to be included in the LSA. |
| **Post-Production and Underages**: | The parties agree that any production underages (including, without limitation, any in-kind or equity investments, if any) in respect of the Project shall be shared pro rata and pari passu among the financiers of the Project in accordance with the finance plan for the Project that has been approved by Media Fund in writing. |
| **Additional Standard Terms:** | The LSA shall include such terms as are standard in connection with investment agreements in the motion picture and television industries, including but not limited to: standard affirmative covenants such as ongoing financial reporting obligations from the Underlying Beneficiary, audit rights for  and notice of material changes, standard negative covenants, indemnification of and remedies for breach. |
| **Confidentiality:** | The parties shall maintain at all times as confidential information the terms of this Term Sheet and the content of any negotiations between them, except that both parties may inform their respective advisors, regulatory authorities, counsel, lenders, or other equity holders and employees with a need to know as each party deems necessary (provided that all such persons are made aware of and agree to abide by the confidentiality hereof). |
| **Governing Law:** | The LSA will be governed by the Laws of New York. |

*[signature page immediately follows]*

dotloop signature verification: dtlp.us/SKZf-fs0b-NwEF

**CREATIVE WEALTH MEDIA FINANCE CORP.**

By: _____

Name: Jason Cloth
Title:   CEO


**INVESTOR**

By: _____

| | dotloop verified |
|---|---|
| *Casey Oaks* | 02/04/22 10:03 AM EST<br>RCGY-EUAW-WNIJ-DXNY |

Name: Casey Oaks
Title:

**SCHEDULE A**

**PROJECT WATERFALL**

## Distribution of Collected Gross Receipts

All Collected Gross Receipts and Collection Account Interest shall be distributed by FCAM to the Beneficiaries in the following manner and order (to the extent said amounts have not already been paid or repaid from any other source, in which case the relevant Party or the Producer shall as soon as reasonably possible notify FCAM of such occurrence or with respect to Residuals, such Residuals have been paid through some other source as notified to FCAM in writing by the Guilds):

### A.    Disbursement of Collected Gross Receipts from the ROW Territory

**Item I:**         **FIRST**

1.  To FCAM in payment of the FCAM's Expenses and FCAM's Remuneration; and thereafter

**Item II:**        **SECOND**

2.  to fund the Guilds Residuals Set-Aside in accordance with Schedule 6 [the residual payment provision in the CAMA], and thereafter,

**Item III:**       **THIRD**

3.  to unions other than the Guilds in payment of the Additional Union Payments; and thereafter

**Item IV**         **FOURTH**

4.  to Distribution Legal in payment of the Distribution Legal Fees; and thereafter

**Item V:**         **FIFTH**

5.  solely from the ROW Territory Collected Gross Receipts, to the ROW Sales Agent in payment of (i) ROW Sales Agent's Fee; and (ii) ROW Sales Agent's Sales Expenses; and thereafter

**Item VI:**        **SIXTH**

6.  to any actual, out of pocket, documented, direct, third party expenses (capped at $5,000 per year per company) to maintain the Producer and PSC in good standing with any applicable governmental authority, including, but not limited to, professional services and payment of fees (including annual sovereign filing expenses) related thereto (but not including any income tax); and thereafter

**Item VII:**       **SEVENTH**

7.  to the E&O Deductible Reserve as notified by Producer to FCAM; and thereafter

**Item VIII:**      **EIGHTH**

8.  to Producer or BRON to pay any actual, direct, verifiable, out-of-pocket third party distribution, business and marketing expenses directly related to the Picture which are not included in the budget for the Picture, expressly excluding Overbudget Expenses, and are not assumed or paid by any third-party distributor of the Picture (including, without limitation any festival expenses) but in any event not more than $150,000 without Lender's approval; and thereafter

**Item IX:        NINTH**

9.  to Lender in repayment of the Lender Repayment Amount until the Lender has issued the Lender Repayment Notice; and thereafter

**Item X:        TENTH**

10. to Tax Credit Lender in repayment of the Tax Credit Lender Repayment Amount until the Tax Credit Lender has issued the Tax Credit Lender Repayment Notice; and thereafter

**Item XI:        ELEVENTH**

11. to Completion Guarantor in payment of any unpaid Completion Guarantor Advances, if any; and thereafter

**Item XII:        TWELFTH**

12. to Producer or BRON to pay Overbudget Expenses; and thereafter

**Item XIII:        THIRTEENTH**

13. to Equity Financiers pro rata in repayment of their respective Investment Amount and Preferred Return; and thereafter

**Item XIV:        FOURTEENTH**

14. in accordance with Part C below.


**B.        Disbursement of Collected Gross Receipts from the US Territory or in the event of a single Worldwide sale**

**Item I:        FIRST**

1.  To FCAM in payment of the FCAM's Expenses and FCAM's Remuneration; and thereafter

**Item II:        SECOND**

2.  to fund the Guilds Residuals Set-Aside in accordance with Schedule 6 [the residual payment provision in the CAMA], and thereafter,

**Item III:        THIRD**

3.  to unions other than the Guilds in payment of the Additional Union Payments; and thereafter

**Item IV        FOURTH**

4.  to Distribution Legal in payment of the Distribution Legal Fees; and thereafter

**Item V:        FIFTH**

5.  solely from the US/Worldwide Territory Collected Gross Receipts, to the Sales Agent in payment of (i) Sales Agent's Fee; and (ii) Sales Agent's Non-Accountable Expenses; and thereafter

dotloop signature verification: dtlp.us/5KZf-fs0b-NwEF

**Item VI:        SIXTH**

6.  to any actual, out of pocket, documented, direct, third party expenses (capped at $5,000 per year per company) to maintain the Producer and PSC in good standing with any applicable governmental authority, including, but not limited to, professional services and payment of fees (including annual sovereign filing expenses) related thereto (but not including any income tax); and thereafter

**Item VII:        SEVENTH**

7.  to the E&O Deductible Reserve as notified by Producer to FCAM; and thereafter

**Item VIII:        EIGHTH**

8.  to Producer or BRON to pay any actual, direct, verifiable, out-of-pocket third party distribution, business and marketing expenses directly related to the Picture which are not included in the budget for the Picture, expressly excluding Overbudget Expenses, and are not assumed or paid by any third-party distributor of the Picture (including, without limitation any festival expenses) but in any event not more than $150,000 without Lender's approval; and thereafter

**Item IX:        NINTH**

9.  to Lender in repayment of the Lender Repayment Amount until the Lender has issued the Lender Repayment Notice; and thereafter

**Item X:        TENTH**

10. to Tax Credit Lender in repayment of the Tax Credit Lender Repayment Amount until the Tax Credit Lender has issued the Tax Credit Lender Repayment Notice; and thereafter

**Item XI:        ELEVENTH**

11. to Completion Guarantor in payment of any unpaid Completion Guarantor Advances, if any; and thereafter

**Item XII:        TWELFTH**

12. to Producer or BRON to pay Overbudget Expenses; and thereafter

**Item XIII:        THIRTEENTH**

13. to Equity Financiers pro rata in repayment of their respective Investment Amount and Preferred Return; and thereafter

**Item XIV:        FOURTEENTH**

14. in accordance with Part C below.

dotloop signature verification: dtlp.us/5KZf-fs0b-NwEF

**C.     Net Profit Disbursement of Collected Gross Receipts from the ROW Territory and US Territory jointly**

**Item I:         FIRST**

1. The remaining balance thereafter shall be referred to as "Net Profits" and shall be applied and distributed on a pari passu as follows:

[Net Profit Participants]

## Definitions

"Additional Union Payments": amounts payable with regard to union- or guild-related obligations (e.g., IATSE, AFM or British Actor's Equity Union) of the Producer other than those paid from the Residuals Set-Aside as advised to FCAM by Producer and/or the payroll house;

"Beneficiaries": those persons or entities who are entitled to participate in the proceed from the CAMA;

"BRON": BRON Studios USA Inc. or its designee;

"CAMA": the collection account management agreement for the Film made between, *inter alios*, FCAM, Producer, PSC, BRON, Lender and Tax Credit Financier;

"Collected Gross Receipts": all monies or any other proceeds (including, but not limited to, advances, guarantees, license fees, overages and deposits and any other revenues generated by the Film without any deduction) derived from any distribution agreement or from any other source of exploitation in the Territory (i.e., the world) relating to the Film or the Rights, but specifically excluding any Tax Credits and any Tax Credit Proceeds (other than the Tax Credit Excess, insurance proceeds and claim recoveries, each of which shall be included in Gross Receipts but such Tax Credit Excess shall not be subject to Items 1-5 in Schedule 5) and actually received or deemed received by the FCAM;

"Collection Account Interest": any interest accrued on the Collected Gross Receipts while held at the FCAM's bank, in a segregated account specifically designated for the Film;

"Completion Guarantor": [Film Finances Canada Ltd.]

"Distribution Legal Fees": reasonable direct and accountable outside legal fees and expenses for Distribution Agreements in an amount not to exceed USD50,000 without Lender's prior written approval (as advised to FCAM by Producer)

"E&O Deductible Reserve" a reserve as reasonably required by Producer for any out-of-pocket insurance deductible (not to exceed $25,000.00) actually paid by Producer in connection with any legal claims or settlements otherwise covered by Company's errors and omissions policy.

"Equity Financiers": financiers of the Film who contributed their funds as equity, if any;

"FCAM": Freeway CAM B.V.;

"Film": [TITLE]

"Guilds": SAG, DGA and WGA;

"Investment Amount": the repayment amount of the contributions made by the Equity Financiers;

"Lender Repayment Amount": all monetary obligations, due to Lender under the Loan Agreement, the exact amounts to be notified in writing to FCAM by Lender in writing;

"Lender Repayment Notice": written notice from Lender to FCAM and copied to the Producer that the Lender Repayment Amount has been indefeasibly paid in full;

dotloop signature verification: dtlp.us/5KZf-fs0b-NwEF

"Lender": [Senior Debt Financier];

"Loan Agreement": the Loan Agreement dated as of [DATE] by and between Lender, PSC and Producer in relation to the Film;

"Overbudget Expenses": amounts actually expended in payment of any actual, direct, verifiable, out of pocket third-party production overages and enhancements directly related to the Film which are not included in the Budget for the Film as notified to FCAM by Producer;

"Party": a party to the CAMA;

"Preferred Return": an accelerated recoupment amount as a percentage of the Investment Amount, not to exceed 20% without the prior written approval of Lender;

"Producer": [Production rightsholding entity];

"PSC": [Production Service Company];

"Residuals Set-Aside": A retention of no more than nine and eight tenths 9.8% of all Collected Gross Receipts as a set-aside for Guild Residuals ("Periodic Gross Receipts").  Said 9.8% of the Collected Gross Receipts shall constitute a temporary "Residuals Set-Aside" earmarked for payment of Residuals (including, Payroll House Fees and Producer Payroll Taxes, if any, in connection with said Residuals) on which the applicable period's Collected Gross Receipts were generated;

"Residuals": all additional compensation which is or may become payable to any Guild-represented employees pursuant to the applicable basic agreement when the Film is exhibited, distributed or otherwise exploited in any Territory, and including, but not limited to, additional compensation payable on advances, minimum guarantees or similar lump sum payments;

"ROW Sales Agent's Fees": an amount not to exceed seven and one-half percent (7.5%) of any Collected Gross Receipts from the ROW Territory, provided that for all second-cycle sales (i.e. sales conducted after the expiration of the term of a distribution agreement), such fee shall not exceed twenty five percent (25%) as advised to FCAM by the ROW Sales Agent;

"ROW Sales Agent's Sales Expenses": any reasonable, actual, direct, verifiable out of pocket, non-overhead, non-salary third party marketing expenses directly related to the Film, provided such costs shall not exceed USD150,000, without the prior written approval of Lender;

"ROW Sales Agent": BRON Releasing USA Inc. or its designee;

"ROW Territory Collected Gross Receipts": Collected Gross Receipts derived from the exploitation of the Film in the ROW Territory;

"ROW Territory": the world, excluding the US Territory;

"Sales Agent": BRON Releasing USA Inc. or its designee;

"Sales Agent Non-Accountable Expenses": any reasonable, actual, direct, verifiable out of pocket, non-overhead, non-salary third party marketing expenses directly related to the Film, provided such costs shall not exceed USD50,000, without the prior written approval of Lender;

"Sales Agent's Fee": an amount not to exceed seven and one-half percent (7.5%) of any Collected Gross Receipts from the US Territory, provided that for all second-cycle sales (i.e.

dotloop signature verification: dtlp.us/5KZf-fs0b-NwEF

sales conducted after the expiration of the term of a distribution agreement), such fee shall be twenty percent (20%) as advised to FCAM by the Sales Agent;

"<u>Tax Credit Lender Repayment Amount</u>": all monetary obligations, due to Lender under the Loan Agreement, the exact amounts to be notified in writing to FCAM by Tax Credit Lender in writing;

"<u>Tax Credit Lender Repayment Notice</u>": written notice from Tax Credit Lender to FCAM and copied to the Producer that the Tax Credit Lender Repayment Amount has been indefeasibly paid in full;

"<u>Tax Credit Lender</u>": a financier who advances money against a priority security interest in the tax credits, rebates or other soft dollar benefits generated by the Picture;

"<u>Tax Credit Loan Agreement</u>": the Loan Agreement dated as of [___] by and between Tax Credit Lender, PSC and Producer in relation to the Film;

"<u>US Territory Collected Gross Receipts</u>": Collected Gross Receipts derived from the exploitation of the Film in the US Territory;

"<u>US Territory</u>": the United States of America, and its territories and possessions and any embassies, military bases, military vessels and other governmental facilities or any ship or airline flying the flag of the United States of America.  The US Territory shall include Canada, its territories possession and any embassies, military bases, military vessels and other governmental facilities or any ship or airline flying the flag of Canada, if necessary for a US Territory sale.

dotloop signature verification: dtlp.us/5KZf-fs0b-NwEF

**SCHEDULE B**

**PROJECT BUDGET AND FINANCE PLAN**

dotloop signature verification: dtlp.us/SKZf-fs0b-NwEF

Updated November 28, 2021

| NATIONAL ANTHEM |
|---|

**Albuquerque, New Mexico**
Director: Tony Tost
Producers: Aaron L. Gilbert, Alex Saks

### Financing

| Source | Type | Amount US$ | Percentage |
|---|---|---|---|
| BRON / CW | Secured Financing | 9,225,000 | 87.86% |
| TPC (Discounted for financing) | Tax Credits | 1,275,000 | 12.14% |
| *Subtotal* | | *10,500,000* | *100.00%* |
| **Budget Total (to be funded)** | | **10,500,000** | |
| | **(Shortfall) Overage** | **-** | 0.00% |

**SCHEDULE C**

**PROJECT ORG CHART**

dotloop signature verification: dtlp.us/5KZf-fs0b-NwEF

