CREATIVE WEALTH MEDIA FINANCE CORP.
PARTICIPATION AGREEMENT

**AGREEMENT** made this 27th day of May, 2022 (the "**Effective Date**") by and between **CREATIVE WEALTH MEDIA FINANCE CORP.**, a Canadian corporation, provincially registered in the Province of Ontario with its office at 151 Bloor Street West, Suite 700, Toronto, Ontario M5S 1S4 (hereinafter referred to as the "**Lender**") and Casey Oaks (hereinafter referred to as the "**Participant**").

**WHEREAS:**

A. Lender has entered into a term sheet agreement attached hereto as Schedule "A" (the "**Term Sheet**") with Robin Hood Digital USA, LLC, Robin Hood Digital PC USA Inc., and Robin Hood Digital PC BC Inc. (hereinafter collectively referred to as the "**Borrower**") in respect of eight (8) episodes of a first season of an animated television series production entitled "Robin Hood" (hereinafter, such initial season is collectively referred to as "**Series 1**"), a true copy of said Term Sheet having been delivered to Participant, and Participant having independently reviewed and approved same;

B. Pursuant to the terms of the Term Sheet, (together with any amendments, supplements, extensions and renewals thereof, and any related agreements, security agreements, documents and instruments, hereinafter collectively referred to as the "**Financing Agreements**"), Lender has entered and/or will enter into certain financing arrangements and has extended and/or will extend from time to time loans, advances, equity investments and other financial accommodations to the Borrower (the "**Advances**"), upon certain collateral security including the present and future accounts of the Borrower (the "**Collateral**"); and

C. Participant wishes to acquire from the Lender, upon the terms and conditions hereinafter set forth, an undivided fractional interest in all present and future Advances by Lender, and to the extent necessary to repay the Participation (as hereinafter defined), an undivided fractional interest in the Collateral.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and promises herein contained, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties), the parties hereto agree as follows:

1. (a) Lender hereby sells to the Participant and the Participant hereby agrees to purchase from the Lender an undivided fractional interest in all present and future Advances made by Lender (the "**Participation**"). The Participation shall be to the extent of USD$[500,000] (4.545%) (the "**Participation Percentage**") of the Advances (hereinafter referred to as the "**Participation Advance**"). The Participation Advance will be paid by Participant to the Lender in accordance with the payment instructions attached hereto at Schedule "B".

   (b) The relationship between Lender and Participant is and shall be that of a seller and purchaser of an undivided fractional interest (i.e., an outright sale and assignment by Lender to Participant of an interest in all present and future Advances by Lender, together with the Collateral therefor), not a debtor-creditor relationship. Accordingly, Lender has not guaranteed repayment to Participant of, nor agreed to repurchase from Participant, any portion of the Participation at any time.

2. Participant agrees that Lender will retain in Lender's name, but to the extent of the Participation, on behalf of Participant, all of the obligations of the Borrower to Lender arising out of the Financing Agreements, and Lender will, in its name, collect and receive payments with respect to all present and future Advances by Lender and of any amounts paid or recovered from (a) the Borrower pursuant to the Financing Agreements, (b) any guarantor or other entity liable in respect of the obligations of the

dotloop signature verification: dtlp.us/8jFY-91c9-PlFZ

- 2 -

    Borrower under the Financing Agreements, or otherwise, and (c) the recovery or realization on any Collateral or other property, rights and claims in favour of Lender or which may be received by or may come into the possession of Lender; provided that any such amounts are applicable to the payment or discharge of any of the obligations of the Borrower pursuant to the Financing Agreements or otherwise (all of the foregoing being hereinafter called "**Collections**").

3.  (a) Participant shall participate in the Collections and be repaid principal and interest and share in "Defined Gross Receipts" (as defined in the Term Sheet) derived from exploitation of Series 1 on and subject to the key terms provided in Schedule "C" (the "**Key Terms**") to the extent of its Participation.

   (b) To the extent of the Participation, Lender is and shall be a trustee for Participant in administering and servicing the Financing Agreements and all rights, remedies and benefits thereunder, including making all present and future Advances, the perfection of security interests and other liens in the Collateral, receiving Collections, execution of agreements in connection therewith and the exercise of all other rights and remedies of a lender and secured party with respect thereto.

   (c) Lender shall have the obligation to account to Participant for Participant's share of the Collections. All Collections and/or payments received by Lender with respect to Participant's interest in all present and future Advances by Lender, including proceeds of Collateral and claims with respect thereto, which are received by Lender shall be held in trust for Participant and deposited by Lender in one or more of its bank accounts and applied as provided herein.

4.  (a) Lender's books and records showing the account between Lender and the Borrower and statements of account rendered to Participant shall be considered accurate unless objected to by Participant within sixty (60) days from their date

   (b) Lender agrees to pay and otherwise account to Participant on or about fifteen (15) calendar days after Lender's actual receipt of amounts due and payable to Lender pursuant to the Financing Agreements, amounts due and payable to Participant after deducting the Commission, pursuant to the Key Terms in respect of the Participation, as such amounts are earned and paid by the Borrower to Lender, pursuant to the terms of the Financing Agreements.

5.  Participant represents and warrants as follows to the Lender at the date of this Agreement and at the date the Participant provides the amount of the Participation Advance to Lender by way of certified cheque, bank draft or wire transfer or such other method of payment acceptable to Lender, or such other date and time as may be determined by Lender (hereinafter referred to as the "**Closing Date**") and acknowledges and confirms that the Lender is relying on such representations and warranties in connection with this Agreement:

   (a) Participant represents and warrants that it is a non-resident of Canada within the meaning of the *Income Tax Act* (Canada) and that it is entitled to receive all payments hereunder without Lender being required to deduct or withhold any amount therefrom on account of duties, taxes, levies, imports, fees, interest or penalties (each a "**Tax**" and collectively "**Taxes**"). If any deduction or withholding for Taxes is required by law or the administrative practice of any taxation authority, Canadian or otherwise, Lender shall be entitled to make such deduction or withholding from any payment hereunder and to pay the full amount so deducted or withheld to the relevant taxation authority in accordance with applicable law. Participant shall notify Lender immediately if any Taxes are required to be deducted or withheld upon any payment to Participant hereunder and shall provide any certificates, Tax forms or other information reasonably requested by Lender in connection with the reporting or payment of

dotloop signature verification: dtlp.us/8jFY-91c9-PlFZ

- 3 -

any Taxes relating to this Agreement. Participant shall indemnify Lender on demand on an after-Tax basis for all losses, claims, liabilities, Taxes or expenses incurred by Lender as result of (i) any failure by the Participant to comply with any Tax reporting or payment requirements relating to this Agreement; (ii) any inaccuracy of the foregoing representation and warranty and (iii) any payment by Lender to Participant hereunder with the required deduction or withholding for Taxes.

(b) The Participation has not been made through, or as a result of, and is not being accompanied by, (i) a general solicitation, (ii) any advertisement including articles, notices or other communications published in any newspaper, magazine or similar media or broadcast over radio or television, or (iii) any seminar or meeting whose attendees have been invited by general solicitation or general advertising.

(c) None of the amounts that the Participant is committing to pay to the Lender are to the knowledge of the Participant, proceeds obtained or derived, directly or indirectly, as a result of illegal activities.

(d) If the Participant is an individual, he or she is of legal age and is legally competent to execute, deliver and perform his or her obligations under this Agreement. If the Participant is not an individual, (i) it has the legal capacity and competence to execute, deliver and perform its obligations under this Agreement; and (ii) the execution and delivery of and performance by the Participant of this Agreement have been authorized by all necessary corporate or other action on the part of the Participant;

(e) If the Participant is committing on its own behalf, this Agreement has been duly executed and delivered by the Participant, and constitutes a legal, valid and binding agreement of the Participant enforceable against him, her or it in accordance with its terms;

(f) The execution and delivery of and performance by the Participant of this Agreement does not and will not (or would not with the giving of notice, the lapse of time or the happening of any other event of condition) result in a breach or violation of or a conflict with, or allow any other person to exercise any rights under any of the terms or provisions of the Participant's constating documents or by-laws, if applicable, or any other contract, agreement, instrument, undertaking or covenant to which the Participant is a party or by which it is bound; and

(g) Participant is an "Accredited Investor" as defined in Securities and Exchange Commission (SEC) Regulation D- Rule 501.

6. Except as otherwise provided in this Section 6, Lender agrees it shall not amend, alter, modify, waive or release in any material respect, the provisions of the Term sheet related to the Interest, Maturity Date, and Lender's right to recoup the Repayment Amount without prior written consent of Participant in each instance. In the event there are other participants with Lender in respect of the arrangements between Lender and Borrower pursuant to the Financing Agreements, Lender and Participant hereby agree that, notwithstanding the immediately preceding sentence, Lender may take any of the material actions referred to in such preceding sentence, and Participant shall be bound thereby, with the consent of such Participants (including Lender as a Participant for this purpose) whose interest in the Participation Advances equal or exceed sixty-six and two-thirds percent (66 2/3%) of the total outstanding Participation Advances. Furthermore, Participant confirms and acknowledges that the Lender is relying on such agreement in connection with the execution of this Agreement.

(a) If the Participant notifies the Lender that it will not give its consent to any of the proposed amendments to be taken by the Lender that are described in this Section 6, the Lender shall

dotloop signature verification: dtlp.us/8jFY-91c9-PlFZ

- 4 -

have the option (exercisable upon the Lender providing the Participant with written notice within ten (10) Business Days (as defined below) of the Participant's non-consenting notice) an amount equal to ten percent (10%) compounded annually or the maximum interest rate allowable by law if said rate equals or exceeds the lawful maximum interest Rate to: (i) purchase, or cause to be purchased, the Participant's Participation hereunder within twenty (20) Business Days after the Lender notifies the Participant in writing of its intention to exercise such purchase option; (ii) terminate, upon written notice to the Participant, the Participation; and (iii) sell or grant any such Participation, or both, to another person. For greater certainty, "**Business Day**" means any day that is not a Saturday, Sunday, or a day on which banks in the state of New York or Canada are required or permitted to be closed.

(b) Any purchase or termination under Section 6(a) shall occur on a date selected by the Lender as specified in its notice as required thereby. Any such purchase shall be at a price equal to the Participation Advance for such Participation, plus accrued Interest (*i.e.,* an amount equal to ten percent (10%) compounded annually or the maximum interest rate allowable by law if said rate equals or exceeds the lawful maximum interest rate) as of the date of purchase, plus the Participant's Participation Percentage of any other monies paid by the Borrower to the Lender under the Financing Agreements and not yet distributed under the terms of this Agreement, through the date of such purchase. The applicable purchase price shall be paid on such date in immediately available funds and, concurrently therewith, the Participant shall execute and deliver to the Lender documents assigning its Participation to the Lender or to such other person as the Lender may direct.

7. Participant shall pay all stamp duty, documentation, registration, transfer or other like Taxes, if any, which may now or hereafter be imposed in connection with this Agreement or the purchase of the Participation and shall indemnify Lender on demand on an after-Tax basis against any liability resulting from any delay or failure by Participant to pay such Taxes. Participant's obligations under this Section shall survive the termination of this Agreement.

8. Participant hereby agrees that Lender shall have the right to carry out the provisions of the Financing Agreements with the Borrower, and to exercise all rights and privileges accruing to it by reason of the provisions thereof, and to enforce its rights thereunder for the joint benefit of Lender and Participant, according to its discretion and the exercise of its business judgment, in accordance with its normal operating procedures.

(a) Participant further acknowledges the risks inherent in making loans and/or equity investments in Series 1 and the related risks inherent in developing, producing, and marketing Series 1, including but not limited to the possibility of cost overruns, lower sales than anticipated and loss of financing. Lender makes no representation or warranty as to the commercial release of Series 1 or the amount of proceeds, if any, to be received from exploitation of Series 1. There is no assurance that Participant will earn a profit from or recoup its Participation. Lender agrees that it will use normal prudence and judgment in the servicing of the account and in the carrying out of the terms of the Financing Agreements. Lender shall not have any liability to Participant with respect to any action taken or omitted by Lender, its employees or agents, in connection with the Financing Agreements or for any error in judgment except for its own gross negligence or wilful misconduct. Lender does not assume, and shall not have, any responsibility or liability, express or implied, for the enforceability or collectability of the Financing Agreements, the Collateral or the condition of the Borrower or guarantors or any obligor, financial or otherwise, or the Collateral, or for the accuracy of any credit or other information furnished by the Borrower unless Lender has acted with gross negligence or wilful misconduct. Participant acknowledges that it may make its own independent investigation of the Borrower and that it will be given access to all information with respect to the Borrower and Lender that it wished to have and an opportunity to make such inquiry of the Borrower

dotloop signature verification: dtlp.us/8jFY-91c9-PlFZ

- 5 -

        as to Borrower's condition and the arrangements between the Borrower and Lender and inquiry of Lender in connection therewith as Participant determines to be necessary or appropriate. Participant has obtained such legal and tax advice as it considers appropriate in connection with the Participation and the execution, delivery and performance by it of this Agreement and the transactions contemplated by this Agreement. The Participant is not relying on the Lender, its affiliates or counsel to any of them in this regard.

    (b)    The Participant acknowledges that: (A) THE PARTICIPATION ADVANCE PROVIDED TO THE LENDER PURSUANT TO THE TERMS AND CONDITIONS HEREOF IS NOT WITHOUT RISK AND THE FINANCIER MAY LOSE FINANCIER'S ENTIRE PARTICIPATION ADVANCE; (B) Lender may complete additional financings or borrowings in the future in order to develop the business of the Lender and fund its ongoing development, and such future financings may affect the Participant's rights hereunder but there is no assurance that such financing will be available, on reasonable terms or at all, and if not available, the Lender may be unable to fund its ongoing development; and (C) the Lender has the right to accept or reject the Participation Advance in whole or in part. If the Participation Advance is rejected in whole or in part, all or a portion of the Participation Advance, as the case may be, will be promptly delivered to the Participant, without interest.

9. Lender agrees that at any time and from time to time during normal business hours, it will permit Participant or its agent to examine Lender's books, records and accounts relating to the Collateral and the Financing Agreements and it will upon request furnish Participant with such information requested as it may have or be reasonably able to obtain with respect to the Collateral or any other matter connected with the Financing Agreements and with copies of all papers and documents relating to the Collateral and the transactions in them and with financial statements and audit reports showing the status of the Collateral. Participant agrees that it will keep all such information confidential.

10. Lender shall not, without the prior written consent of Participant, offset any claim or demand in favour of Lender or of any other client of Lender pertaining to indebtedness or obligations of Borrower wherein Participant does not participate, against or to the detriment of Participant, Participant shall not, without the prior written consent of Lender, offset any claim or demand in favour of Participant against or to the detriment of Lender or to the detriment of any credit balances for or to the account of the Borrower. In the event of any claim or action arising out of this Agreement, both Lender and Participant agree not to deduct, counterclaim or set-off any amounts which may be owed on account of other dealings between them; and, similarly, no amounts owing under this Agreement shall be deducted counterclaimed or set-off on account of other dealings between Lender and Participant.

11. This Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of the parties hereto and shall be governed and interpreted in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

12. Participant shall not sell, pledge, assign, sub-participate or otherwise transfer its rights under this Participation Agreement, the Collateral, or the Collections, without the prior written consent of Lender.

13. Nothing contained herein shall confer upon Lender or Participant any interest in, or subject either of them to any liability for, or in respect of the business, assets, profits, losses or liabilities of the other, except only as to the Participation.

14. All notices, requests and demands to or upon the respective parties hereto shall be deemed to have been duly given or made: if by hand, immediately upon sending; if by overnight delivery service, one(1) day after dispatch; and if mailed by registered mail, return receipt requested, five (5) days after mailing.

dotloop signature verification: dtlp.us/8jFY-91c9-PIFZ

- 6 -

All notices, requests and demands are to be given or made to the respective parties at the address set forth herein; if to Lender, to the attention of:

> Creative Wealth Media Finance Corp.
> 151 Bloor St West Suite 700, Toronto, Ontario M5S 1S4
> <u>Attention</u>: Jason Cloth
>
> if to Participant, to the attention of
> 2920 Carlisle Street Apt. 1502, Dallas, TX 75204
> <u>Attention: Casey Oaks</u>

15. Each of the parties hereto confirms that it has no loans or financing transactions with the Borrower, or any guarantor except those transactions which are the subject of this Agreement or have been disclosed in writing to the other party and each agrees not to enter into any financing arrangement with any of them without notifying the other party hereto. Participant shall not, and will cause its subsidiaries and affiliates not to contact, directly or indirectly, any Borrower or any guarantor, for the purpose of soliciting or taking away the financial or other services furnished by Lender to the Borrower.

16. In the event Lender should at any time terminate the Financing Agreements for any reason it shall promptly notify Participant thereof and this Agreement shall automatically terminate effective upon the effective date of the termination of the Financing Agreements. In addition, Lender shall have the right to purchase the Participation for the full amount thereof, together with accrued interest and concurrently therewith terminate this Agreement effective at the end of the initial term of the Financing Agreements upon at least thirty (30) days prior written notice. Termination of the Participation Agreement shall not affect the respective rights or obligations hereunder incurred prior to the effective date of such termination including obligations to participate in post-termination Advances in the event of liquidation.

17. This Agreement will be governed by, interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein. Participant irrevocably attorns and submits to the non-exclusive jurisdiction of the courts of the Province of Ontario with respect to any matters arising out of this Agreement and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

18. Participant will execute, deliver, file and otherwise assist the Lender in filing any reports, undertakings and other documents required in connection with this Agreement.

19. The following Schedules are incorporated into and form an integral part of this Agreement, and any reference to this Agreement includes the Schedules:

> Schedule "A"   Term Sheet
> Schedule "B"   Payment Information
> Schedule "C"   Key Terms

**Assignment**

This Agreement becomes effective when executed by all of the parties to it. After that time, it will be binding upon and enure to the benefit of the parties and their respective successors, heirs, executors, administrators and legal representatives. This Agreement is only transferable and/or assignable by the Lender.

Case 3:23-cv-02833-X    Document 23-12    Filed 04/09/25    Page 6 of 20    PageID 386

dotloop signature verification: dtlp.us/8jFY-91c9-PlFZ

- 7 -

**Entire Agreement**

This Agreement including the schedules constitutes the entire agreement between the parties with respect to the transactions contemplated by it and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. There are no representations, warranties, covenants, conditions or other agreements, express or implied, collateral, statutory or otherwise, between the parties in connection with the subject matter of this Agreement, except as specifically set forth in this Agreement. The parties have not relied and are not relying on any other information, discussion or understanding in entering into and completing the transactions contemplated by this Agreement.

**Time of Essence**

Time is of the essence in this Agreement.

**Language of Documents**

It is the express wish of the parties to this Agreement that this Agreement and all related documents be drafted in English. Les parties aux présentes conviennent et exigent que cette convention ainsi que tous les documents s'y rattachant soient rédigés en langue Anglais.

**Execution by Facsimile and Counterparts**

This Agreement including the schedules may be executed in any number of counterparts (including counterparts by facsimile or electronic transmission or portable document format ["PDF"]) each of which including facsimile or electronic transmissions or PDFs when so executed and delivered shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument.

- 8 -

The parties have executed this Agreement on the dates set forth below to be effective as of the Effective Date.

**CREATIVE WEALTH MEDIA FINANCE CORP.**

Per: _/s/ Jason Cloth_

Name: Jason Cloth
Title: Authorized Signing Officer

Date:

**PARTICIPANT**

Per: _Casey Oaks_
dotloop verified
05/27/22 11:25 AM CDT
RPMN-MXX8-Y8UH-9G1U

Name: Casey Oaks

Date:

dotloop signature verification: dtlp.us/8jFY-91c9-PIFZ

## SCHEDULE "A"

## TERM SHEET

[see attached]

## SCHEDULE "B"

## PAYMENT INFORMATION

The Participation Advance may be included with the executed Participation Agreement by certified cheque or bank draft payable to CREATIVE WEALTH MEDIA FINANCE CORP., 151 Bloor Street West, Suite 700, Toronto, Ontario M5S 1S4 or wired in immediately available funds to Creative Wealth Media Finance Corp. as follows:

▇▇▇▇▇▇

| ▇▇ | ▇▇▇▇▇ |
|---|---|
| ▇▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇▇ |
| ▇▇▇▇ | ▇▇ ▇▇▇▇▇ |
| ▇▇ | ▇▇▇▇▇▇▇▇ |
| ▇▇▇▇▇▇ | ▇▇▇▇▇▇▇▇▇▇ |
| ▇▇▇▇▇▇ | ▇▇ |
| ▇▇▇▇▇▇ | ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ |

dotloop signature verification: dtlp.us/yeu5-Qn8b-3OUY

# TERM SHEET
## FINANCING FOR BRON DIGITAL SERIES ENTITLED
### "ROBIN HOOD" (the "Project")

Dated as of  May 27th, 2022

| | |
|---|---|
| **Media Fund:** | Creative Wealth Media Finance Corp. (the "Media Fund"), wishes to obtain financing from Investor in connection with the production of the Project. |
| **Underlying Beneficiary** | Robin Hood Digital USA, LLC ("Underlying Beneficiary") |
| **Investor:** | Casey Oaks (the "Investor") |
| **Investment** | Investor shall provide Media Fund with an amount of $**500,000** (the "Investment") representing 4.545% of $11,000,000 USD loan, which Investment shall be subject to the same terms as the Loan as set forth hereunder. |
| **Loan:** | Subject to satisfaction of certain conditions precedent, as more fully set forth in a subsequent agreement, Investor will advance to Media Fund in the amount of up to USD $17,715,000 USD (inclusive of the Facilitation Fee) (the "Loan"). |
| **Interest Rate:** | The Investment will bear flat interest of 10% (the "Interest") for the term of the loan. |
| **Maturity Date:** | The Loan shall mature August 15, 2022. |
| **Facilitation Fee** | The Loan shall include a fee equal to eight and a half percent (8.5%) plus up to $50,000 for legal expenses (the "Facilitation Fee"): the Facilitation Fee shall be used to pay the costs and expenses of the legal fees and administrative fees incurred in the administration, oversight and reporting of the performance of the Investment by the Media Fund.  (For clarity, the Investment itself is not subject to a Facilitation Fee.) |
| **Source of Repayment** | The Loan, inclusive of the Facilitation Fee, the Interest and the Net Profit Participation shall all be recouped from gross receipts generated by the Project, if any, in accordance with the Allocation of Defined Gross Receipts as defined herein. |
| **Budget** | The final gross budget for the Project will not exceed USD$18,700,000 USD (i.e. inclusive of tax credits).  Neither Media |

dotloop signature verification: dtlp.us/yeu5-Qn8b-3OUY

| | |
|---|---|
| | Fund nor Investor shall be responsible for any expenditures in excess of the budget, if any. |
| **Use of Investment:** | Proceeds of the Loan, less the Facilitation Fee, shall be used exclusively to finance the pre-production, production, post-production, and delivery of the Project. |
| **Project Specifications:** | The Project shall have the following specifications:<br><br>1. Be based on the scripts by Murray Miller and Crystal Meers which are based on the stories of Robin Hood and his Merry Men.<br>2. Production overseen by BRON Digital.<br>3. Have an MPAA rating no more restrictive of TV-G. |
| **Allocation of Defined Gross Receipts** | Defined Gross Receipts, exclusive of all tax credit proceeds used to repay the tax credit financier (if any), shall be allocated as set forth in the Waterfall attached as Schedule A. |
| **Net Profit Participation:** | In consideration for funding the $11,000,000 USD Commitment Amount, Borrower shall pay Media Fund an amount equal to 45% of the Net Profits. Media Fund shall allocate and pay Investors 100% of the 45% Net Profits. "**Net Profits**" shall be defined and allocated as set forth in the Waterfall attached as Schedule A. |
| **Media Fund Representations and Warranties:** | a. There is no action, suit or proceeding (actual or threatened) at law or in equity or by or before any governmental instrumentality or other agency concerning the Project, or any investigation of the affairs concerning the in any respect.<br>b. Underlying Beneficiary owns all right, title and interest necessary to make, distribute, exhibit and otherwise exploit the Project throughout the universe.<br>c. The Project will be completed and delivered and will be technically acceptable to premium SVOD exhibitors and broadcasters U.S. and elsewhere.<br>d. Media Fund a duly constituted, registered and organized company and is in good standing under the laws governing it, and has the right and authority to enter into this Term Sheet and to grant the rights provided to Investor set forth herein |
| **Investor Representations and Warranties** | a. Investor is an "Accredited Investor" as defined in OSC Rule 45-501.<br>b. Investor has relied on its own examination of the investment hereunder including, but not limited to, the LSA and the merits and risks involved. Investor is aware that it may be required to |

dotloop signature verification: dtlp.us/yeu5-Qn8b-3OUY

| | |
|---|---|
| | bear the financial risks of this investment for an indefinite period of time. |
| **Additional Standard Terms** | A long form agreement memorializing the term hereof, if any, shall include such terms as are standard in connection with investment agreements in the motion picture and television industries, including but not limited to: standard affirmative covenants such as ongoing financial reporting obligations from the Media Fund, audit rights for Investor and notice of material changes, standard negative covenants, indemnification of Investor and remedies for breach. |
| **Confidentiality:** | The parties shall maintain at all times as confidential information the terms of this Term Sheet and the content of any negotiations between them, except that both parties may inform their respective advisors, regulatory authorities, counsel, lenders, or other equity holders and employees with a need to know as each party deems necessary (provided that all such persons are made aware of and agree to abide by the confidentiality hereof). |
| **Governing Law:** | This Term Sheet will be governed by the laws of the Province of Ontario. |
| **Other:** | All terms of this Term Sheet shall be legally binding agreements of the parties hereto. |
| | This Term Sheet may be executed in one or more counterparts, whether holographically or electronically and may be sent by portable document format ("PDF"), each of which shall constitute an original hereof and which together shall constitute one agreement. |

[Signature Page to Follow]

Agreed and accepted as of ____May 13 2022____.

CREATIVE WEALTH MEDIA FINANCE CORP.

By: _____/s/ Jason Cloth_____

Name: __Jason Cloth__

[INVESTOR]

By: __Casey Oaks__  
dotloop verified  
05/27/22 11:25 AM CDT  
1IJD-7TEW-1JLY-P3AZ

Name: __Casey Oaks__

dotloop signature verification: dtlp.us/yeu5-Qn8b-3OUY

## SCHEDULE A

### Distribution of Collected Gross Receipts

All Collected Gross Receipts and Collection Account Interest shall be distributed by FCAM to the Beneficiaries in the following manner and order (to the extent said amounts have not already been paid or repaid from any other source, in which case the relevant Party or the Producer shall as soon as reasonably possible notify FCAM of such occurrence or with respect to Residuals, such Residuals have been paid through some other source as notified to FCAM in writing by the Guilds):

**A.**     **Disbursement of Collected Gross Receipts from the United States and Canadian Territories**

**Item I:**     **FIRST**

1. To FCAM in payment of the FCAM's Expenses and FCAM's Remuneration; and thereafter

**Item II:**     **SECOND**

2. to fund the Residuals Set-Aside in accordance with Schedule 6 [the residual payment provision in the CAMA], and thereafter,

**Item III:**     **THIRD**

3. to unions other than the Guilds in payment of Additional Union Payments; and thereafter

**Item IV:**     **FOURTH**

4. solely from the Domestic Territory Collected Gross Receipts, to the Sales Agent in payment of (i) Domestic Sales Agent's Non-Deferred Fee; and (ii) Domestic Sales Agent's Sales Expenses; and thereafter

**Item V**     **FIFTH**

5. to Distribution Legal in payment of the Distribution Legal Fees; and thereafter

**Item VI:**     **SIXTH**

6. to any actual, out of pocket, documented, direct, third party expenses to maintain the Producer and PSC in good standing with any applicable governmental authority, including, but not limited to, professional services and payment of fees (including annual sovereign filing expenses) related thereto (but not including any income tax), but in any event not more than $5,000 per company, per year; and thereafter

**Item VII:**     **SEVENTH**

7. to Lender in repayment of the Lender Repayment Amount until the Lender has issued the Lender Repayment Notice; and thereafter

**Item VIII:**     **EIGHTH**

8. to Domestic Sales Agent in payment of the Domestic Sales Agent Deferred Fee; and thereafter

**Item IX:**     **NINTH**

9. to Producer or BRON to pay Overbudget Expenses; and thereafter

**Item X: TENTH**

10. to Tax Credit Lender in repayment of the Tax Credit Lender Repayment Amount until the Tax Credit Lender has issued the Tax Credit Lender Repayment Notice; and thereafter

**Item XI:**     **ELEVENTH**

11. in accordance with Part C below.

**B.     Disbursement of Collected Gross Receipts from the ROW Territory**

**Item I:**     **FIRST**

1. To FCAM in payment of the FCAM's Expenses and FCAM's Remuneration; and thereafter

**Item II:**     **SECOND**

2. to fund the Residuals Set-Aside in accordance with Schedule 6 [the residual payment provision in the CAMA], and thereafter,

**Item III:**     **THIRD**

3. to unions other than the Guilds in payment of the Additional Union Payments; and thereafter

**Item IV**     **FOURTH**

4. to Distribution Legal in payment of the Distribution Legal Fees; and thereafter

**Item V:**     **FIFTH**

5. solely from the ROW Territory Collected Gross Receipts, to the Sales Agent in payment of (i) ROW Sales Agent's Non-Deferred Fee; and (ii) ROW Sales Agent's Sales Expenses; and thereafter

**Item VI:**     **SIXTH**

6. to any actual, out of pocket, documented, direct, third party expenses to maintain the Producer and PSC in good standing with any applicable governmental authority, including, but not limited to, professional services and payment of fees (including annual sovereign filing expenses) related thereto (but not including any income tax), but in any event not more than $5,000 per company, per year; and thereafter

**Item VII:**     **SEVENTH**

7. to Lender in repayment of the Lender Repayment Amount until the Lender has issued the Lender Repayment Notice; and thereafter

**Item VIII:**     **EIGHTH**

8. to ROW Sales Agent in payment of the ROW Sales Agent Deferred Fee; and thereafter

dotloop signature verification: dtlp.us/yeu5-Qn8b-3OUY

**Item X: TENTH**

9. to Tax Credit Lender in repayment of the Tax Credit Lender Repayment Amount until the Tax Credit Lender has issued the Tax Credit Lender Repayment Notice; and thereafter

**Item IX:      NINTH**

10. to Producer or BRON to pay Overbudget Expenses; and thereafter

**Item XI:      ELEVENTH**

11. in accordance with Part C below.

**C.      NET PROFITS**

All Collected Gross Receipts received in the Collection Account following application in accordance with Parts A and B above shall be applied as follows:

**Item I:       FIRST**

1. The remaining balance thereafter shall be referred to as "Net Profits" and shall be applied and distributed on a pari passu as follows:

45% to Media Fund, 100% of which shall be allocated to Media Fund Investors.

Case 3:23-cv-02833-X   Document 23-12   Filed 04/09/25   Page 17 of 20   PageID 397

## Definitions

"Additional Union Payments": amounts payable with regard to union- or guild-related obligations (e.g., IATSE, AFM or British Actor's Equity Union) of the Producer other than those paid from the Residuals Set-Aside as advised to FCAM by Producer and/or the payroll house;

"Beneficiaries": those persons or entities who are entitled to part of the CAMA;

"BRON": BRON Digital USA, Inc.;

"CAMA": the collection account management agreement for the Project made between, *inter alios*, FCAM, Producer, PSC, BRON, Lender and Tax Credit Financier;

"Canadian Territory": The provinces and territories of Canada and any embassies, military bases, military vessels and other governmental facilities or any ship or airline flying the flag of Canada;

"Collected Gross Receipts": all monies or any other proceeds (including, but not limited to, advances, guarantees, license fees, overages and deposits and any other revenues generated by the Project without any deduction) derived from any distribution agreement or from any other source of exploitation in the Territory relating to the Project or the Rights, including, but not limited to merchandising, publishing, soundtrack and ancillaries, but specifically excluding any Tax Credits and any Tax Credit Proceeds (other than the Tax Credit Excess, insurance proceeds and claim recoveries, each of which shall be included in Gross Receipts but such Tax Credit Excess shall not be subject to Items 1-4 in Schedule 5) and actually received or deemed received by the FCAM;

"Collection Account Interest": any interest accrued on the Collected Gross Receipts while held at the FCAM's bank, in a segregated account specifically designated for the Project;

"Distribution Legal Fees": reasonable direct and accountable outside legal fees and expenses for Distribution Agreements in an amount not to exceed USD50,000 without Lender's prior written approval (as advised to FCAM by Producer)

"Domestic Sales Agent's Deferred Fee": an amount equal to six percent (6%) of any Collected Gross Receipts from the US and/or Canadian Territory, provided that for all second-cycle sales (i.e. sales conducted after the expiration of the term of a distribution agreement), such fee shall be twelve percent (12%) as advised to FCAM by the Domestic Sales Agent

"Domestic Sales Agent's Non-Deferred Fee": an amount equal to fifty percent (50%) of the Domestic Sales Agent's Deferred Fee;

"Domestic Territory Collected Gross Receipts": Collected Gross Receipts derived from the exploitation of the Project in the United States and Canadian Territories;

"FCAM": Freeway CAM B.V.;

"Guilds": SAG-AFTRA and WGA (if applicable);

"Lender Repayment Amount": all monetary obligations, due to Lender under the Loan Agreement, the exact amounts to be notified in writing to FCAM by Lender in writing;

---

Investment Term Sheet  8  Confidential
ROBIN HOOD

dotloop signature verification: dtlp.us/yeu5-Qn8b-3OUY

"Lender Repayment Notice": written notice from Lender to FCAM and copied to the Producer that the Lender Repayment Amount has been indefeasibly paid in full;

"Lender": Creative Wealth Media Finance Corp.;

"Loan Agreement": the Loan Agreement dated as of April [__], 2021 by and between Lender and Producer in relation to the Project;

"Overbudget Expenses": amounts actually expended in payment of any actual, direct, verifiable, out of pocket third-party production overages and enhancements directly related to the Project which are not included in the Budget for the Project as notified to FCAM by Producer;

"Party": a party to the CAMA;

"Producer": Robin Hood Digital USA, LLC;

"Project": Digital

"PSC": individually and collectively, Robin Hood Digital PC USA and Robin Hood Digital PC BC Inc.;

"Residuals Set-Aside": A retention of nine and eight tenths 6.2% of all Collected Gross Receipts as a set-aside for Guild Residuals.  Said 6.2% of the Collected Gross Receipts shall constitute a temporary "Residuals Set-Aside" earmarked for payment of Residuals (including, Payroll House Fees and Producer Payroll Taxes, if any, in connection with said Residuals) on which the applicable period's Collected Gross Receipts were generated;

"Residuals": all additional compensation which is or may become payable to any Guild-represented employees pursuant to the applicable basic agreement when the Project is exhibited, distributed or otherwise exploited in any Territory, and including, but not limited to, additional compensation payable on advances, minimum guarantees or similar lump sum payments;

"Rights":  all copyright, distribution and similar rights in and to the Picture and all ancillary rights or associated rights thereto (excluding remake, sequel, prequel and any other subsequent production rights and the underlying rights thereof) including, without limitation, gaming, novelization, merchandising, mobile, soundtrack, stageplay and music publishing rights.

"ROW Sales Agent's Deferred Fees": an amount not to exceed ten percent (10%) of any Collected Gross Receipts from the ROW Territory, provided that for all second-cycle sales (i.e. sales conducted after the expiration of the term of a distribution agreement), such fee shall be twenty percent (20%) as advised to FCAM by the ROW Sales Agent;

"ROW Sales Agent's Non-Deferred Fee": an amount equal to fifty percent (50%) of the ROW Sales Agent's Deferred Fee;

"ROW Sales Agent's Sales Expenses": any reasonable, actual, direct, verifiable out of pocket, non-overhead, non-salary third party marketing expenses directly related to the Project, provided such costs shall not exceed USD150,000, without the prior written approval of Lender;

"ROW Territory Collected Gross Receipts": Collected Gross Receipts derived from the exploitation of the Project in the ROW Territory;

Investment Term Sheet                                    9                                        Confidential
ROBIN HOOD

dotloop signature verification: dtlp.us/yeu5-Qn8b-3OUY

"ROW Territory": the world, excluding the Canadian Territory and the US Territory;

"Sales Agent" individually and collectively, BRON Releasing Inc., BRON Releasing US Inc. and BRON Releasing UK Ltd.

"Tax Credit Lender Repayment Amount": all monetary obligations, due to Lender under the Loan Agreement, the exact amounts to be notified in writing to FCAM by Tax Credit Lender in writing;

"Tax Credit Lender Repayment Notice": written notice from Tax Credit Lender to FCAM and copied to the Producer that the Tax Credit Lender Repayment Amount has been indefeasibly paid in full;

"Tax Credit Lender": a financier who advances money against a priority security interest in the tax credits, rebates or other soft dollar benefits generated by the Project;

"Tax Credit Loan Agreement": the Loan Agreement dated as of [__], 2020 by and between Tax Credit Lender, PSC and Producer in relation to the Project;

"US Territory Collected Gross Receipts": Collected Gross Receipts derived from the exploitation of the Project in the US Territory;

"US Territory": the United States of America, and its territories and possessions and any embassies, military bases, military vessels and other governmental facilities or any ship or airline flying the flag of the United States of America;